IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| EAGLE FORCE HOLDINGS, LLC, and EF INVESTMENTS, LLC, | § § § | No. 399, 2017 |
| Plaintiffs Below, Appellants, | § § § § | Court Below: |
| v. | § § | Court of Chancery of the State of Delaware |
| STANLEY V. CAMPBELL, | § § | C.A. No. 10803-VCMR |
| Defendant Below, Appellee. | § § § | |

Submitted: March 7, 2018
Decided: May 24, 2018

Before **STRINE**, Chief Justice, **VALIHURA**, **VAUGHN**, **SEITZ**, and **TRAYNOR**, Justices, constituting the Court *en Banc*.

Upon appeal from the Court of Chancery. **REVERSED** and **REMANDED**.

Frank E. Noyes, II, Esquire, Offit Kurman, P.A., Wilmington, Delaware. Of Counsel: Harold M. Walter, Esquire, Baltimore, Maryland, for Appellants.

David L. Finger, Esquire, Finger and Slanina, LLC, Wilmington, Delaware, for Appellee.

**VALIHURA**, Justice, for the Majority:

One of the first things first-year law students learn in their basic contracts course is that, in general, "the formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and a consideration."[1] In other words, there must be a "meeting of the minds" that there is a contract supported by consideration. However, in the context of real life disputes, the basic elements are not always as straightforward as they might appear in the hornbooks. This case presents such a situation, where determining something as seemingly simple as whether a contract was formed proves a challenging endeavor.

After months of negotiations, the parties here signed versions of two transaction agreements: a limited liability company agreement, and a contribution and assignment agreement. However, a serious question exists as to whether the parties intended to be bound by these signed documents. And whether there exists a valid, binding contract implicates the other main issue raised on appeal—namely, whether this Court can exercise jurisdiction over the defendant. If at least one of these transaction documents is a valid, independently enforceable contract, then this Court has jurisdiction via a forum selection clause favoring Delaware. If neither document is independently enforceable, and if earlier agreements do not provide another means of exercising jurisdiction over the defendant, then Delaware courts lack personal jurisdiction over the defendant, and the plaintiffs' claims for breach of contract, unjust enrichment, and other causes of action against the defendant were properly dismissed.

---

[1] Restatement (Second) of Contracts § 17 (1981) [hereinafter Restatement].

In this unusual case, after numerous evidentiary hearings, a five-day trial, and several motions for contempt—proceedings spanning more than two years—the Court of Chancery determined that neither transaction document is enforceable. As a result, the Court of Chancery dismissed the case for lack of personal jurisdiction, even after finding one of the parties in contempt of its status quo order.

In *Osborn ex rel. Osborn v. Kemp*,[2] this Court set forth the elements of a valid, enforceable contract. We explained that "a valid contract exists when (1) the parties intended that the contract would bind them, (2) the terms of the contract are sufficiently definite, and (3) the parties exchange legal consideration."[3]

The trial court did not apply this test in this case. Though it mentioned the *Osborn* test, the trial court primarily relied on *Leeds*,[4] a Court of Chancery opinion that addresses the enforceability of letters of intent and provides that "determination of whether a binding contract was entered into will depend on the materiality of the outstanding issues in the draft agreement and the circumstances of the negotiations."[5] Applying *Leeds*, the trial court found that the agreement was not sufficiently definite due to a lack of agreement on certain material terms, primarily the consideration to be exchanged. Although this could be viewed as an implicit finding that the parties could never have intended to be bound, we

---

[2] 991 A.2d 1153 (Del. 2010).

[3] *Id.* at 1158.

[4] *Leeds v. First Allied Conn. Corp.*, 521 A.2d 1095 (Del. Ch. 1986).

[5] *Eagle Force Holdings, LLC v. Campbell* (*Trial Op.*), 2017 WL 3833210, at *14 (Del. Ch. Sept. 1, 2017) (quoting *Greetham v. Sogima L–A Manager, LLC*, 2008 WL 4767722, at *15 (Del. Ch. Nov. 3, 2008) (citing *Leeds*, 521 A.2d at 1101-02)).

2

believe that there is force in appellants' contention that the parties' intent to be bound requires a separate factual finding.

In this case, there is evidence within the four corners of the documents and other powerful, contemporaneous evidence, including the execution of the agreements, that suggests the parties intended to be bound. But we acknowledge that there is also evidence that cuts the other way. Given that this is a question of fact, we remand to the Court of Chancery to make such a finding.

*Osborn*'s second inquiry, *i.e.*, whether the contract's terms are sufficiently definite, is largely a question of law. We believe that the agreements sufficiently address all issues identified by the trial court as material to the parties—including the consideration to be exchanged. We remand because, although we conclude that the second and third *Osborn* prongs are satisfied, we recognize that the trial court's conclusions as to the parties' intent to be bound impact the analysis and ultimate determination as to whether a contract has been formed.[6]

If either document is enforceable, then the forum selection provisions are also enforceable. And, for reasons discussed below, we also find that the Court of Chancery erred in finding that its jurisdiction to enforce the previously issued contempt order depended on the enforceability of the transaction documents. It has jurisdiction to enforce its order regardless of the transaction documents' enforceability.

---

[6] The parties do not dispute the third prong of the *Osborn* analysis—namely, whether there was sufficient consideration.

Thus, we REVERSE the Court of Chancery's decision and REMAND this case with instructions to the trial court to reconsider the evidence and make a finding on the parties' intent to be bound to each transaction document in accordance with the framework set forth in *Osborn* and guidance included in this opinion. We also REVERSE and REMAND to the Court of Chancery to enforce its contempt order, and so even if, on remand, the Court of Chancery adheres to its earlier conclusion that the transaction documents are unenforceable, it will need to decide the other contempt allegations pending in that court.

I.

Defendant-appellee Stanley Campbell is the creator of PADRE, a software system that aggregates medical information about patients to help physicians determine the appropriate medications to prescribe.[7] He founded EagleForce Associates, Inc. ("Associates"), a Virginia Corporation, to develop and market PADRE. In November 2013, Associates had just been denied a government contract, and Campbell reasoned that it would have a better chance of succeeding if it were better capitalized.[8] Perhaps even more pressing, the company also needed funding to stay afloat.[9] It had no revenue.[10]

---

[7] This narrative relies on the facts as found by the Court of Chancery and cites to its Memorandum Opinion (*Trial Op.*). Where other facts are referenced, citations are to the record (including to the Appendix to Appellants' Opening Brief, as indicated by page numbers beginning with the letter "A").

[8] *Trial Op.*, 2017 WL 3833210, at *3.

[9] *Id.* at *2.

[10] *Id.*; Chris Cresswell Trial Testimony (Feb. 8, 2017), at A1900 [hereinafter Cresswell Testimony]; Jashuva Variganti Trial Testimony (Feb. 8, 2017), at A1911 [hereinafter Variganti Testimony].

4

In seeking the much-needed capitalization, Campbell approached Richard Kay, a businessman and investor based in the Washington, D.C., area whom he had asked to invest in the company once before.[11] This time Kay agreed. To keep Associates operational, and without a written agreement obligating him to do so, Kay provided it funding through EF Investments LLC, a Delaware LLC.

Campbell and Kay sketched out their vision for their venture in a letter agreement dated November 15, 2013.[12] They planned to form "a new LLC entity and/or a series of industry specific LLC's [sic] verticals in Virginia."[13] Campbell was to contribute to the venture his "PADRE source code and patents" (as described in the agreement), and Kay was to contribute $1.8 million in cash—"the amount stated by [Campbell] that he contributed to the effort so far . . . ."[14] They would "each own 50% of the new companies" and agreed "to never dilute less than 50.1% together in order to maintain control." They also promised to vote their shares as a block and to "confer on all business and marketing related activities as well as all capital needs."[15]

---

[11] *Trial Op.*, 2017 WL 3833210, at *2-3.

[12] *Id.* at *1, *3 ("Kay's lawyers at the law firm Offit Kurman drafted an initial version of the November letter agreement, but Campbell and Kay independently made changes to it themselves before signing."); November 2013 Letter Agreement (Nov. 15, 2013) (signed Nov. 27, 2013), at A45-46 [hereinafter November Letter Agreement].

[13] *Trial Op.*, 2017 WL 3833210, at *3 (quoting November Letter Agreement, *supra* note 12, at A45).

[14] November Letter Agreement, *supra* note 12, at A45.

[15] *Trial Op.*, 2017 WL 3833210, at *3 (quoting November Letter Agreement, *supra* note 12, at A45).

5

Diligence progressed through the winter and, in early April 2014, the parties signed a new letter agreement (the "April Letter Agreement") that "amends" the November letter and "provides binding terms and conditions for [Campbell] and [Kay] to proceed with this venture."[16] The April Letter Agreement envisioned that "a new LLC will be formed to serve as a parent entity ('Holdco') for [Associates] and the recently formed EagleForce Health Solutions, LLC," and that "ownership shall consist of [Campbell] and [Kay] only with equal rights to them or their heirs."[17] The agreement provided that, aside from Associates and EagleForce Health Solutions LLC ("EF Health"),[18] "[a]dditional new wholly owned Holdco subsidiaries shall be formed for each subsequent area of opportunity, such as online gambling, identity and cybersecurity, that Holdco elects to pursue."[19] We refer to Associates and EF Health collectively as the "Targeted Companies," the "subsidiaries," and "EagleForce" in this opinion.

The April Letter Agreement reiterated that Campbell and Kay would each own 50% of Holdco directly, and 50% of the wholly owned subsidiaries, Associates and EF Health,

---

[16] April 2014 Letter Agreement (Apr. 4, 2014), at A50 [hereinafter April Letter Agreement].

[17] *Id.* at A50.

[18] The trial court opinion does not explain the difference between EagleForce Health Solutions, LLC, as used in the April Letter Agreement, and EagleForce Health, LLC, a Virginia limited liability company that, along with Associates, is described as one of the "Targeted Companies" in the Contribution Agreement discussed *infra*. The trial court also does not explain when each of these entities were formed other than quoting to the April Letter Agreement's reference to EagleForce Health Solutions as "recently formed." *Trial Op.*, 2017 WL 3833210, at *3. We refer to both EagleForce Health Solutions, LLC, and EagleForce Health, LLC, as "EF Health."

[19] April Letter Agreement, *supra* note 16, at A50.

indirectly through Holdco.[20] And it confirmed that Campbell and Kay would never dilute their ownership "less than 51% together in order to maintain joint control," and that "their vote will always be uniformly tied as a single vote thus protecting each of them from complete loss of control."[21]

To obtain his 50% ownership interest in Holdco, Campbell would contribute all intellectual property and licensing agreements related to PADRE. The agreement estimated that this property was worth $2.3 million.[22] For his part, Kay would advance $500,000 to Holdco upon the execution of the letter agreement (evidenced by a demand promissory note that Associates and EF Health would issue jointly and severally to Kay) and contribute an additional $1,800,000 to Holdco—for a total of $2.3 million—once they agreed on an LLC operating agreement, which they promised to sign at a future date.[23] The April Letter Agreement provided that Campbell would receive a $500,000 distribution from Holdco for his personal use upon signing an operating agreement.[24]

In the meantime, absent a formal LLC operating agreement, the April Letter Agreement further delineated the management responsibilities of the two partners outlined in the November letter into two "swim lanes," as the parties described them.[25] Campbell

---

[20] *Id.* at A51.

[21] *Id.*

[22] *See Trial Op.*, 2017 WL 3833210, at *4; April Letter Agreement, *supra* note 16, at A51.

[23] *Trial Op.*, 2017 WL 3833210, at *4.

[24] *Id.*

[25] *Id.*

7

was to serve as a "member, President and Chairman of the 3 member Holdco Board,"[26] and his lane included "primary responsibility over all information technology, product development, R & D, and customer service and maintenance, in each case subject to an annual budget approved by the Holdco board."[27] Further, Kay was to serve as a member and CEO of Holdco, and his swim lane included "primary responsibility over financial matters, personnel/HR, and management of outside accounting, legal, tax and other advisors and consultants as well as all other matters relating to the operation of the business of Holdco and its subsidiaries . . . ." But the agreement also specified that Kay "will consult with [Campbell] on all decisions affecting these functions."[28]

The Court of Chancery observed that, soon after the signing of the April Letter Agreement, "[a]s Kay became more involved in EagleForce Associates, Kay and Campbell's relationship began to sour."[29] For example, Kay told a new employee that Campbell had previously committed fraud, and Kay "did not get along with certain EagleForce employees . . . ."[30]

Nonetheless, the parties began negotiating a Contribution Agreement and LLC Agreement (collectively the "Transaction Documents") to consummate their transaction.[31]

---

[26] April Letter Agreement, *supra* note 16, at A50.

[27] *Trial Op.*, 2017 WL 3833210, at *4.

[28] *Id.*

[29] *Id.* at *5.

[30] *Id.*

[31] *Id.* at *6.

8

At the advice of Kay's counsel, Michael Schlesinger of Latham & Watkins, Campbell sought separate representation and enlisted Donald Rogers of the Shulman Rogers firm. On May 13, Latham sent Rogers a draft LLC Agreement that referred to the holding company as Eagle Force Holdings LLC ("Holdings" or the "Company"), a Delaware LLC, and indicated that it had been formed on March 17, 2014—*before* the signing of the April Letter Agreement.[32] Thus, the Court of Chancery observed that Campbell "was aware that Kay [had] formed Eagle Force Holdings in Delaware at least by May 13, 2014," the day he received the draft LLC Agreement from Latham.[33] This draft of the LLC Agreement also included a forum selection clause whereby the parties were to consent to personal jurisdiction in Delaware and an arbitration clause.[34]

Negotiations and diligence continued through the spring and early summer, and the parties met with counsel on July 7 to attempt to resolve some outstanding issues, such as the precise scope of the intellectual property that Campbell would contribute to Holdings, and Campbell's belief that, to succeed, the company needed $7.8 million in capital, which was $5.5 million more than Kay's planned $2.3 million contribution.[35] As summarized in

---

[32] *Id.* Specifically, the draft LLC Agreement indicated that it was to govern "Eagle Force Holdings, LLC, a Delaware limited liability company," which was formed "under the Delaware Limited Liability Company Act by the filing of a Certificate of Formation with the Secretary of State of the State of Delaware on March 17, 2014." Draft LLC Agreement (May 13, 2014), at A99. The draft also indicated that its execution would amend the Original LLC Agreement, which consisted of an agreement executed on March 17, 2014, and the April Letter Agreement. *See id.*

[33] *Trial Op.*, 2017 WL 3833210, at *6.

[34] *Id.*

[35] *Id.*

9

the trial court opinion, Campbell and Kay determined that Campbell would "contribute all of the intellectual property he had created that was related to the EagleForce business" and that, to avoid diluting Campbell and Kay at the Holdings level, they would raise the additional $5.5 million in capital by selling up to 20% of the equity of each of the subsidiary Targeted Companies, Associates and EF Health.[36]

But there was a new hitch: Kay's attorney, Theodore Offit of Offit Kurman, P.A., discovered that Campbell had previously filed for bankruptcy, and Campbell had failed to list PADRE's intellectual property on the schedules of his bankruptcy petition. This revelation raised doubts about Campbell's title to the intellectual property that he planned to contribute to Holdings. Offit urged Campbell to reopen his bankruptcy to amend the petition to include the missing intellectual property. But Campbell feared that two bankruptcies on his record would lead future EagleForce investors to question his competency to serve in company management.

Campbell and Kay each signed signature pages for their attorneys to keep in escrow and trade upon consummation of the deal—one possible means of avoiding future logistical hassle had they been forced to collect signature pages later. Campbell also signed a note payable to Kay by Associates for the $700,000 that Kay had already contributed to Associates given that they had not yet agreed on an operating agreement for Holdings. Campbell and Kay further agreed that Campbell would cancel the note once the Transaction Documents were finalized.

---

[36] *Id.* at *7.

The parties continued to negotiate and exchange drafts of the Transaction Documents through the late spring and summer, and Kay kept extending capital to the company to keep it afloat. But he decided to stop around August 1, 2014.[37] The move ratcheted up the pressure on Campbell to finalize the deal given that EagleForce still lacked sales revenue and needed funds to pay its employees. Campbell missed the company's rent for both July and August and borrowed $50,000 from his wife to meet the company's August 7 payroll obligations.[38]

But the issues of Campbell's title to the intellectual property and his resistance to reopening the bankruptcy were proving to be sticking points. At one meeting among the parties and counsel, on August 5, Campbell walked out of discussions to "ma[ke] clear" that he would not reopen the bankruptcy, according to his testimony.[39]

By August 14, Campbell and Kay had resolved certain other outstanding issues, and they summarized their discussion in a handwritten list of thirteen points of agreement (the "Thirteen-Points List"). For example, they agreed that the company would raise capital by issuing up to 17% of the capital of each of Holdings' subsidiaries. Given that Holdings

---

[37] *See* Summary List of Kay Monetary Contributions on behalf of EagleForce (July 16, 2015), at 1104.

[38] *See* Transcript of Katrina Powers Trial Testimony (Feb. 6, 2017), at A1667-68; Bank Statements for Eagleforce Associates Washington First Checking Account #4141 (showing outgoing payments to ADP on 08/07/14 that were returned the following day for insufficient funds; incoming wire from Cheryl R. Campbell for $50,000.00 on 08/08/14); Transcript of Stanley Campbell Deposition Testimony (Aug. 19, 2016), at A1358-59.

[39] *Trial Op.*, 2017 WL 3833210, at *8.

would own 80% of the subsidiaries' equity, the remaining 3% would be allocated to a new stock appreciation rights plan (the "SARS Plan") for employees as incentive compensation.

The employment contracts of several employees of the subsidiaries contemplated participation in a SARS plan, and the future of these rights had been complicating negotiations. For example, the employment agreement of one existing Associates employee, Vice President of Finance and CFO Said S. Salah, provided that he was entitled to 2.5% of Associates' equity if it achieved "prorated new business sales of at least $6.0 million over the next two years."[40] But the Thirteen-Points List provided that Salah "will be entitled to SAR [sic] only if [Campbell] wants to give non-voting equity," that it would be "from his side," and that Kay "is not obligated at all" for Salah's rights.[41]

EF Health's General Manager, Christopher Cresswell, and Associates' Senior Vice President, Lieutenant General John W. Morgan III, also had employment agreements entitling them to participate in a SARS plan at their respective subsidiaries. And, of particular concern, as the Court of Chancery noted, "Cresswell and Morgan were both entitled to immediate vesting of any SARs they had been granted upon a sale or change of control of the EagleForce businesses."[42]

---

[40] *Id.* at *2. The Court of Chancery cited to an exhibit to the May 5, 2017 hearing on Plaintiffs' motion for contempt and post-trial oral argument. Thus, it relied on evidence that was never introduced at trial. *See id.* at *2, *2 n.18 (quoting and citing Employment Letter for Said Salah (May 13, 2013; signed by Salah May 15, 2013), at A2229) [hereinafter, collectively with the employment agreements for Lieutenant General John W. Morgan III, Dr. Hany Salah, and Christopher Creswell, at A2224-31, the "Employment Letters"].

[41] *Trial Op.*, 2017 WL 3833210, at *8.

[42] *Id.* at *5.

According to the Thirteen-Points List, Campbell also agreed to relinquish any right to veto new investors and that each of the subsidiaries would have three-person boards, composed of Campbell, Kay, and a third person (initially Mitchell Johnson).[43] The drafts that Campbell's attorney, Rogers, circulated on August 19 included certain of the changes outlined in the Thirteen-Points List, but "back tracked on some of Campbell's concessions," such as by giving Campbell a veto right on new investors.[44] Nonetheless, the drafts were responsive to certain of Kay's requests, such as that the contribution agreement include a provision requiring that Campbell take the steps to reopen his bankruptcy, and a provision requiring Kay to fund an escrow account to pay claims by Campbell's former creditors.[45]

Campbell followed up with an email to Kay and the parties' lawyers in which he stated that Kay and Campbell had agreed to commit up to $5,000 each to retain Campbell's personal bankruptcy lawyer to attempt to determine his title to the intellectual property and, if such efforts failed, that Campbell would contribute $250,000 of the $500,000 distribution that he was to receive at closing to "an attorney escrow of [his] choice for a period not to exceed 6 months."[46] The Court of Chancery summarized that "Campbell was willing to

---

[43] *Id.* at *8; Thirteen-Points List (Aug. 14, 2014), at A152.

[44] *Trial Op.*, 2017 WL 3833210, at *8.

[45] *Id.*

[46] *Id.* at *9 (quoting E-mail from Campbell to Offit and Rogers and copying Kay (Aug. 22. 2014), at A381).

13

set aside funds to pay any creditor claims, but he did not want to reopen a bankruptcy proceeding."[47]

Further, the parties had still not determined how to address the SARS granted to certain other EagleForce employees in their employment agreements. Kay's attorney, Offit, initially suggested that these employees be asked to waive their rights for the promise of "new and better defined executive incentive benefits."[48] Accordingly, Offit drafted representations from Campbell that the relevant employees "had executed releases for any profit sharing plan" and lacked "any legal or equitable ownership interest in EagleForce Associates or EagleForce Holdings."[49] But the trial court found that "[t]he evidence does not show that either Campbell or Kay approached the EagleForce Associates employees to resolve this issue."[50] Thus, in his August 19 revised draft, Rogers bolded and bracketed the representations concerning the releases and noted that "[CAMPBELL] CANNOT GUARANTEE THIS. WE NEED TO DISCUSS."[51] The trial court also found that Kay and Offit both knew that, as of August 19, Associates had not yet secured releases from its employees.[52]

---

[47] *Id.*

[48] *Id.*

[49] *Id.*

[50] *Id.*

[51] *Id.*

[52] *Id.*

Nonetheless, after a few follow-up conversations, Rogers sent an e-mail to Kay, Offit, and Campbell on August 25 in which he stated:

> Based on the resolution of the 'big issues', [sic] I believe we should be able to finalize the document within the next few days.
>
> Also, I would like to have the opportunity to talk to you about the documentation of the SAR plan and the offer letters. No major issue. Just want to make certain that there is total clarity on what is being offered to employees.[53]

Offit replied with another round of revisions to the Transaction Documents on August 27. His cover email to Campbell and Rogers stated, "Please confirm your acceptance of the terms of these agreements. Please commence preparation of schedules needed for closing."[54] The attached document was marked in the upper-right-hand corner "OK [Offit Kurman] Draft 8-26-14," and the spaces for the "Execution Date" on the cover page and in the first paragraph were left blank.

Articles II and III listed the events to occur at "Closing," defined as occurring "not before each of the actions and deliveries [of consideration] described in Sections 3.2 through 3.5 have been taken or made (as the case may be)," and as taking place "at the office of the Company, commencing at 10:00 a.m. local time on the date hereof (the 'Closing Date') or at such other time and place as the Parties may agree upon in writing."[55]

---

[53] E-mail from Rogers to Offit and copying Campbell and Kay (Aug. 25, 2015), at A382.

[54] *Trial Op.*, 2017 WL 3833210, at *9.

[55] *Id.*; Executed Contribution and Assignment Agreement by and between Eagle Force Holdings, LLC, a Delaware limited liability company, and Stanley V. Campbell (Aug. 28, 2014), § 3.1, at A666 [hereinafter Executed Contribution Agreement].

15

Importantly, Section 2.2 provided, in unequivocal terms, that Campbell was to contribute *all* the subsidiaries' equity and *all* of his relevant intellectual property:

> At the Closing, Campbell shall contribute, transfer, assign, convey and deliver to the Company, absolutely and unconditionally, and free and clear of all Encumbrances (the "Campbell Contribution"):
>
> (a) *all* right, title and interest in and to the Targeted Companies Securities, such that, after such contribution, the Company shall hold *all* of the Targeted Companies Securities; and
>
> (b) *all* right, title and interest in and to <u>any and all</u> Intellectual Property owned in whole or in part by Campbell and which is used or related to, or which can be used or related to: Health; Identity Management; Cyber Security, including, but not limited to, the government data bases obtained by Campbell through contact with the Social Security Administration, Medicare and Medicaid, which [sic] (collectively, the <u>Transferred IP</u>), which Intellectual Property is set forth on <u>Schedule 2.2(b)</u> attached hereto. . . .[56]

Schedule 2.2(b) provided a detailed list of such property defined as "Transferred IP."[57] The Contribution Agreement also provided that, at Closing, "Campbell shall deliver verification that he has reopened his previous bankruptcy proceeding . . . ."[58] In return, Holdings would "issue to Campbell the number of Class A Units set forth opposite [Campbell's] name on <u>Schedule 2.3</u> hereto (the 'Equity Consideration Schedule') . . . ."[59] However, the Equity Consideration Schedule was not attached.

---

[56] *Id.* §§ 2.2(a) and (b), at A665 (italicized emphases added).

[57] *Id.* § 2.2(b), at A710-14.

[58] *Id.* § 3.2(c), at A666.

[59] *Id.* § 2.3, at A665.

16

Aside from Schedule 2.2(b) listing the Transferred IP, none of the other schedules was completed.[60]

Many of the incomplete or blank schedules were supposed to provide details concerning Campbell's representations and warranties in Article IV.

According to the trial court, Sections 4.20(d) and 4.20(f) "make clear that Schedule 3.5 includes all of Campbell's intellectual property license agreements." But Schedule 3.5 is blank other than its subheading, "Assumed Agreements."[61]

Section 4.3(a) posits that "Schedule 4.3(a) sets forth, as of the date hereof, (i) the number and class of authorized securities for each Targeted Company, (ii) the number and class of Targeted Companies Securities for each Targeted Company and (iii) the number and class of Targeted Companies Securities held of record by Campbell for each Targeted Company."[62] But Schedule 4.3 (including 4.3(a)) is incomplete. It only includes the subheading "Capitalization Table" and the bracketed text "[Also describe SARS Plan]."[63] Nonetheless, the SARS Plan is defined elsewhere, in Exhibit A, as "mean[ing] the existing stock appreciation rights plan currently in effect which is described in Schedule 4.3(b)." But both sides agree in this appeal that there was no "SARS Plan."[64]

---

[60] *Trial Op.*, 2017 WL 3833210, at *9.

[61] *Id.*; Executed Contribution Agreement, *supra* note 55, Schedule 3.5, at A715.

[62] *Trial Op.*, 2017 WL 3833210, at *9; Executed Contribution Agreement, *supra* note 55, § 4.3(a), at A670.

[63] Executed Contribution Agreement, *supra* note 55, Schedule 4.3(a), at A773. Both sides agree that, whatever a SAR was supposed to be, it was not "equity." *See* Appellants' Opening Br. at 39-41; Appellee's Answering Br. at 42 n.13 (noting that "Campbell testified that SARS are not literally equity").

[64] *See* Appellants' Opening Br. at 16, 43; Appellee's Answering Br. at 41-42.

Section 4.3 (entitled, "Capitalization") makes certain additional representations. Importantly, Section 4.3(e) states that "Campbell is the true and lawful owner of all the Targeted Companies Securities set forth opposite his name on Schedule 4.3(a), which constitute all of the issued and outstanding Targeted Companies Securities, and has full capacity, power and authority to surrender the Targeted Companies Securities for exchange pursuant to the terms of this Agreement, free and clear of any Encumbrances, and such Targeted Companies Securities are not subject to any adverse claims."[65] Other representations, such as in Section 4.3(b), state, "[e]xcept for the SARS Plan, there are no outstanding options, warrants, calls, profit sharing rights, bonus plan rights, rights of conversion or other rights, agreements, arrangements or commitments relating to Targeted Companies Securities . . . ."[66] Section 4.3(d) further represents and warrants that "[t]he revenue sharing plans and/or profit sharing plans for Chris Creswell [and other listed employees including John Morgan] . . . have been eliminated without continuing liability to any Targeted Company, and each of the foregoing persons has given the appropriate Targeted Company a legally binding release from any further liability for such plans."[67] Similarly, subsection (e) also states that "[n]either Chris Creswell, Said Saleh nor any

---

[65] Executed Contribution Agreement, *supra* note 55, § 4.3(e), at A671.

[66] *Id.* § 4.3(b), at A670; *see also id.* § 4.3(d), at A671 ("Except for the SARS plan, there are (i) no rights, agreements, arrangements or commitments relating to the Targeted Companies Securities to which any Targeted Company is a party, or by which it is bound, obligating any Targeted Company to repurchase, redeem or otherwise acquire any issued and outstanding shares of Targeted Companies Securities . . . .").

[67] *Id.* § 4.3(d), at A671.

member of the family of Said Saleh have any legal or equitable ownership interest in any Targeted Companies Securities."[68]

There are several additional blank schedules. Section 4.12(c) provides that, "[e]xcept as set forth on Schedule 4.12(c), neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated hereby, . . . will . . . accelerate the vesting, funding or time of payment of any compensation, equity award or other benefit . . . ."[69] Schedule 4.12(c) is blank aside from its subheading, "Effect of Transaction on Certain Payments."[70] Similarly, Schedules 4.6 ("Liabilities of Targeted Companies"),[71] 4.9 ("Real Property Leases and Licenses"),[72] and 4.15(a) ("Certain Proceedings and Orders"),[73] among others, are also left blank.

Section 8.4(a) provides that "[t]his Agreement, together with the exhibits and schedules hereto (including the Campbell Disclosure Schedules, Schedules 8.3 and 8.4 and the other Transaction Documents referred to herein), constitutes the entire agreement among the parties pertaining to the subject matter hereof and supersedes all prior agreements, understandings, negotiations and discussions, whether oral or written, of the

---

[68] *Id.* § 4.3(e), at A671 (misspelling Cresswell's and Salah's last names).

[69] *Trial Op.*, 2017 WL 3833210, at *9; Executed Contribution Agreement, *supra* note 55, § 4.12(c), at A675.

[70] Executed Contribution Agreement, *supra* note 55, Schedule 4.12(c), at A780.

[71] *Id.* Schedule 4.6, at A775.

[72] *Id.* Schedule 4.9, at A776.

[73] *Id.* Schedule 4.15(a), at A784.

parties."[74] However, Section 8.4(b) specified that any provision could be waived or modified "if, and only if," signed by both parties or, for waiver, the party against whom the waiver was to be effective.[75] Despite the reference to Schedules 8.3 and 8.4, these schedules do not appear in the signed version.

The term "Campbell Disclosure Schedules" is defined as "the schedules prepared and delivered by Campbell for and to the Company and dated as of the Execution Date which modify (by setting forth exceptions to) the representations and warranties contained herein and set forth certain other information called for by this Agreement."[76]

The Agreement's choice of law provision selected Delaware law,[77] and its forum selection clause provided that "any suit, action or other legal proceeding arising out of this Agreement may be brought in the United States District Court for Delaware or, if such court does not have jurisdiction or will not accept jurisdiction, in any court of general jurisdiction in the City of Wilmington, Delaware . . . ."[78] The parties "irrevocably consent[ed] to the service of any process or pleading by any method permitted under Delaware law."[79] The Agreement also included a severability provision.[80]

---

[74] *Id.* § 8.4(a), at A696.

[75] *Id.* § 8.4(b), at A696.

[76] *Trial Op.*, 2017 WL 3833210, at *10; Executed Contribution Agreement, *supra* note 55, Exhibit A, at A700.

[77] Executed Contribution Agreement, *supra* note 55, § 8.3, at A695.

[78] *Id.* § 8.9(b), at A697.

[79] *Id.* § 8.9(a), at A697.

[80] *Id.* § 8.7, at A696.

The signed Amended and Restated LLC Agreement (the "LLC Agreement") noted that it was amending and restating the "Original LLC Agreement," which was dated March 17, 2014, and amended in April 2014.[81] This new, signed LLC Agreement specified that Campbell and Kay shall be the sole members of the initial Board of Managers.[82] It also designated Campbell as initial Chairman of the Board of Managers and President. The Agreement provided that the Chairman "shall work with the President and Chief Executive Officer as to matters relating to the Company's business."[83] The LLC Agreement also named Campbell as President with the management responsibilities resembling his "swim lane" as articulated in the April Letter Agreement.[84] Meanwhile, Kay was appointed Chief Executive Officer, but the LLC Agreement now provided that Kay "may act independently of, and without being required to consult with, all other officers of the Company, including the President," with respect to each of certain designated areas.[85] Further, Section 3.2 describes the capital contributions of the parties and states that they are set forth in Schedule A. That schedule shows their initial capital account balances, a fifty-fifty split of

---

[81] Executed Amended and Restated Limited Liability Company Agreement of Eagle Force Holdings LLC (dated as of Aug. 25, 2014, and executed Aug. 28, 2014), at 719 [hereinafter Executed LLC Agreement]. The part of the Original LLC Agreement dated as of March 17, 2014, does not appear to be in the record before us, unless it is referring to the Certificate of Formation of that date. *See* Eagle Force Holdings, LLC Certificate of Formation (Mar. 17, 2014), at A47-49.

[82] *Id.* § 4.1.1, at A729.

[83] *Id.* § 4.4.2, at A734.

[84] *Id.* § 4.4.3, at A735.

[85] *Id.* § 4.4.4, at A735.

21

all of Holdings' issued and outstanding Class A Units: 50,000,000 units for EF Investments, LLC (Kay's investment vehicle), and 50,000,000 units for Campbell.[86]

Like the Contribution Agreement, the LLC Agreement also included choice of law and forum selection clauses specifying that Delaware law governs and that the parties consented to the exclusive jurisdiction of state and federal courts sitting in Delaware "for the purpose of any action, claim, cause of action or suit (in contract, tort or otherwise), inquiry, proceeding or investigation arising out of or based upon this Agreement or relating to the subject matter hereof"[87]—a broader range of actions than the class of actions covered by the Contribution Agreement's forum selection clause.

Moreover, the LLC Agreement states in Section 13.1 that "[t]his Agreement," which was defined as the LLC Agreement itself, "contains the entire contract among the Members as to the subject matter *hereof*."[88]   In contrast, Section 13.10 with the subheading "Complete Agreement" states that "[t]his Agreement, together with its Schedules and any other document signed by the parties at or after the signing of this Agreement constitute the complete agreement between the parties concerning the subject matter *in such documents* and supersede all prior written or oral understandings among such parties."[89] The LLC Agreement also has a severability clause that provides, in part, that, "[i]f any provision of this Agreement is determined by a court to be invalid or unenforceable, that

---

[86] *Id.* § 3.2, at A722; *id.*, Schedule A, at A770.

[87] *Id.* §§ 12.1, 12.2, at A752.

[88] *Id.* §§ 13.1, at A755 (emphasis added).

[89] *Id.* §§ 13.10, at A757 (emphasis added).

determination shall not affect the other provisions hereof, each of which shall be construed and enforced as if the invalid or unenforceable portion were not contained herein."[90]

The next day, August 28, at around 7:00 p.m., Campbell and Kay met at Associates' offices without their lawyers. At trial, Campbell testified that Kay had assured him that the attorneys "were done" reviewing the agreements, but Kay disputed that characterization.[91] Campbell tried to call his attorney, Rogers, but he could not reach him as he was away from the office. Campbell testified that Kay also tried to call his counsel, Offit, but was not able to reach him either. But Kay also disputed that he tried to call Offit.

At this meeting on August 28, both parties signed each of the Transaction Documents circulated on August 27 with the terms described above.[92] Katrina Powers, the CFO of one of Kay's companies, Sentrillion, witnessed the signing. And the Court of Chancery found that, "[a]fter Kay and Campbell signed the agreements, Campbell walked around his desk and embraced Kay and Powers."[93] However, the Court of Chancery noted that the parties dispute whether the embrace was a "hug" or a "dap handshake."[94]

Rogers returned from vacation unaware that the parties had signed the Transaction Documents and believing negotiations were ongoing. Thus, on September 9, he circulated

---

[90] *Id.* § 13.4, at A756.

[91] *Trial Op.*, 2017 WL 3833210, at *10.

[92] The Transaction Documents included the draft of the Contribution Agreement that was marked "OK [*i.e.*, Offit Kurman] DRAFT 8-26-14." *Id.*

[93] *Id.* at *11.

[94] *Id.* at *11 n.162 (noting that Kay and Powers testified that Campbell hugged both of them, and Campbell testified that he gave Kay a "dap handshake").

proposed edits and comments to the Transaction Documents.[95]  Following Section 4.3(d) of the Contribution Agreement, the representation concerning the SARS releases from employees, Rogers commented:

> THERE IS STILL MUCH THAT NEEDS TO BE CLARIFIED HERE: (1) We are not confident that we have all of the SAR Plan offers; (2) Burden of the SARs should not be solely on [Campbell] because [Kay] authored it; (3) Chris Cresswell's offer was developed by [Kay]; (4) There was a discussion about the company taking responsibility for the SARs up to a certain level. We need to understand what percentage of SARs was originally granted to understand the ultimate impact on [Campbell].[96]

Rogers also stated in his cover email that he anticipated having difficulty representing the financial health of the companies given that only Kay had the financial information for the past six months.[97]

Yet the parties continued negotiating over additional revisions that month, including during a conference call among Campbell, Kay, and their attorneys on September 17. According to the trial court's opinion, "Offit testified that Kay stated on the call that he was willing to discuss potential amendments to the agreements but was not willing to rescind and re-execute them.  But Rogers did not remember the contents of that call."[98]

---

[95] *Id.* at *11.

[96] *Id.*  Rogers later testified that he made no material changes to the Transaction Documents in his September 9 drafts, and that his comment concerning the SARS Plan excerpted above did not propose edits to the document itself as he confirmed, "[a] SARs plan would be a separate agreement, yes."  Donald Rogers Trial Testimony (Feb. 9, 2017), at A2047.

[97] *Trial Op.*, 2017 WL 3833210, at *11.; E-mail from Rogers to Offit, copying Campbell and Kay and attaching revised Transaction Documents (Sept. 9, 2014), at A799.

[98] *Trial Op.*, 2017 WL 3833210, at *12.

By late October, the parties had still not closed the deal. Kay wrote to Offit, Campbell, and Rogers, asking "[w]hat else can we do together to get this done. I understand we have signed the deal but need the exhibits."[99] But Campbell retorted "[t]he signatures on the drafts did not represent the completed document which remains not completed given the two or three remaining items."[100]

Kay countered on November 19 by reiterating his view that the signed Transaction Documents were binding contracts that obligated Campbell to complete the steps for Closing. He argued that Campbell was in breach because he refused to assign ownership of his intellectual property to Holdings and reopen his bankruptcy, among other things.[101] Yet, despite the dispute between Campbell and Kay, Kay continued to fund EagleForce's payroll obligation until early February 2015.[102] By that point, Kay had contributed at least $1,983,491.00 to EagleForce.[103]

---

[99] *Id.*

[100] *Id.*

[101] *See id.*; E-mail from Offit to Campbell and Rogers, and copying Kay (Nov. 19, 2015), at A1096 (writing to Campbell: "You are contractually obligated to: (i) deliver the schedules to the Contribution Agreement, (ii) reopen of [sic] your bankruptcy case, (iii) assign of [sic] ownership of all your IP to EagleForce Holdings LLC, and (iv) assign ownership of EagleForce Associates, Inc. and EagleForce Health, LLC to EagleForce Holdings, LLC.").

[102] *Trial Op.*, 2017 WL 3833210, at *12.

[103] *See* Summary List of Kay Monetary Contributions on behalf of Eagle Force (July 16, 2015), at A1104-05.

That month, February 2015, EagleForce achieved its first sales revenue ever—$700,000 from PSKW, LLC.[104]  Thus, with an alternative base of operating cash in hand, Campbell moved to cut ties with Kay.  And, on February 18, 2015, he wrote to Kay and the attorneys:

> [W]e have reached an impass [sic] that we are unable to resolve.  I would respectfully request that the atty's get together to discuss the means and methods for us to close this matter and allow us to move on.  We have booked the funding as a loan and will proceed with amending the existing documentation in a means that is reasonable for us both.[105]

Kay responded the following morning:

> Your email is totally untrue, misleading[,] and the EF investment money has never been a loan[.]  You know that as does everyone.  I am 50 percent owner and will continue to operate in that role.[106]

On March 17, 2015, Holdings and Kay's investment vehicle, EF Investments, LLC ("Plaintiffs") filed the first complaint in this action against Campbell seeking specific performance requiring Campbell to close the transaction and immediate injunctive relief directing Campbell to comply with his obligations under the Transaction Documents.[107]  The suit also sought money damages for breach of contract, unjust enrichment, and breach of fiduciary duty, among other causes of action (seven total, later amended to nine total

---

[104] Cresswell Testimony, *supra* note 10, at A1900; Variganti Testimony, *supra* note 10, at A1917-18.

[105] *Trial Op.*, 2017 WL 3833210, at *13; E-mail from Campbell to Kay (Feb. 18, 2015), at A1100.

[106] E-mail from Kay to Campbell (Feb. 19, 2015), at A1100.

[107] Complaint (March 17, 2015), ¶¶ 30, 38, 61.  The First Amended Complaint (the operative complaint) was filed on June 5, 2015. *See* First Amended Complaint (June 5, 2015), available via File & Serve*Xpress*.

with the First Amended Complaint).[108] On May 7, Plaintiffs also moved for emergency interim relief, seeking an order temporarily restraining Campbell "from refusing to provide information concerning the operations and finances of [Holdings] and the Targeted Companies" and refusing to identify any other contracts that he may have entered into on behalf of these companies, and otherwise upholding the status quo.[109]

Campbell immediately disputed that the Court of Chancery had personal jurisdiction over him.[110] The Vice Chancellor suggested at a conference among the parties that Plaintiffs' pleadings on the existence of a Delaware LLC agreement sufficed to confer personal jurisdiction for the purposes of determining the appropriateness of interim relief.[111] At a subsequent hearing on the motion for interim emergency relief, on July 9, 2017, the Vice Chancellor observed, "I don't think the Court's going to be able to resolve whether there is or isn't personal jurisdiction without resolving whether there were or were not agreements reached between these parties."[112] Thus, he stated that "[a]ll issues as far

---

[108] *Id.* ¶ 74.

[109] Brief in Support of Motion of Plaintiffs Eagle Force Holdings, LLC and EF Investments, LLC for Interim Emergency Relief Pursuant to Ct. Ch. R.65(b) (May 7, 2015), at 25, available via File & Serve*Xpress*.

[110] *See* Motion for a More Definite Statement and To Dismiss and/or Stay the Complaint (Apr. 27, 2015), available via File & Serve*Xpress*.

[111] Transcript of Scheduling Conference (May 15, 2017), at 16-17, available via File & Serve*Xpress*.

[112] Transcript of Oral Argument on Plaintiffs' Renewed Motion for Interim Emergency Relief and Rulings of the Court (July 9, 2015), at 48, available via File & Serve*Xpress*.

as the personal jurisdiction are preserved and they may come up in a summary judgment context or some sort of thing like that that the Court will have enough before it."[113]

At the July 9 hearing on the request for interim relief, the court ruled that, although Plaintiffs could not satisfy the mandatory preliminary injunction standard, they could satisfy "the normal preliminary injunction standard with respect to their request for information and blocking rights" as Plaintiffs had a "reasonable probability of success on the merits."[114] The court reasoned that, "[a]lthough Campbell disputes the effect of his signature, it cannot be disputed that plaintiffs have submitted signed copies of the transaction documents." And the Vice Chancellor added, "[s]imilarly, the record also supports an inference that, for at least some period of time, Kay actively was involved in the management of the Eagle Force businesses, which favors plaintiffs' argument that there was an agreement as to the existence and nature of the Holdings LLC."[115]

The court also stated:

Finally, and importantly, Kay formed Holdings as a Delaware LLC, and plaintiffs purportedly have paid over $2 million to Campbell, Health, or Associates, and that is a course of action which appears designed to follow through on the transaction contemplated by the April letter agreement and the allegedly memorialized version of that in the transaction document.

Under Delaware law, an LLC agreement is designed "to give maximum effect to the principle of freedom of contract and to the enforceability of limited liability company agreements." Such agreements can be "written, oral or implied" under 6 Delaware Code Section 18-101(7). Which side ultimately will prevail at trial currently is unclear, but I am comfortable

---

[113] *Id.* at 49.

[114] *Id.* at 71.

[115] *Id.* at 72.

concluding on the current record that plaintiffs have demonstrated a reasonable probability of success on the merits.[116]

Thus, on July 23, 2015, the court granted Plaintiffs' requested status quo order (the "Order"), providing them access to information concerning the Targeted Companies while litigation was pending.[117] The Order also required Campbell to give Plaintiffs ten days advance notice of any transaction subject to the Order and mandated that any transaction that Plaintiffs objected to in writing could not proceed without court approval.[118]

On May 27, 2016, while proceedings were pending before the trial court, Plaintiffs moved for sanctions and to hold Campbell in contempt for violating the Order.[119] The Court of Chancery (with another Vice Chancellor succeeding the retiring prior presiding Vice Chancellor in this matter) held an evidentiary hearing on August 31, 2016, and Campbell appeared in court and testified.[120] But Campbell failed to show up the next day as directed by the trial court. The court ultimately found Campbell in contempt for failing

---

[116] *Id.* at 72-73. At oral argument before this Court, Campbell's counsel stated that Campbell has not returned any of the money contributed by Kay, but that Campbell is "willing to" do so "with interest," over a "payout period," and "perhaps even possibly" with "an exit bonus." Oral Argument at 29:59-30:27, https://livestream.com/accounts/5969852/events/8091956/videos/171199929 [hereinafter Oral Argument].

[117] *Trial Op.*, 2017 WL 3833210, at *13. The Order also directed Associates and EF Health to provide Plaintiffs with weekly reports of all sales or distribution leads concerning the Transferred IP (referenced in § 2.2(b)), weekly bank statements, weekly statements of accounts receivable and accounts payable, and bi-weekly payroll statements annotated with explanations for any changes, among other information. *Id.*; Order Granting Plaintiffs' Petition for Interim Relief Pursuant to Ct. Ch. R. 65(b) (July 23, 2015), available File & Serve*Xpress* [hereinafter Status Quo Order].

[118] *Trial Op.*, 2017 WL 3833210, at *13; Status Quo Order, *supra* note 117, at 4-8.

[119] *Trial Op.*, 2017 WL 3833210, at *13.

[120] *Id.*

to give Plaintiffs the required advance notice before withdrawing approximately $100,000 in accrued unreimbursed expenses from Associates and paying $38,000 in vendor fees. However, the court delayed determining the remedy until after it resolved whether it had personal jurisdiction over Campbell. Still, it did require Campbell to reimburse Plaintiffs on or before December 23, 2016, for Plaintiffs' attorneys' fees of $4,639.00 for the day that Campbell refused to show up in court.[121] Campbell did not deposit the funds until the business day following the deadline, December 27.[122]

The Court of Chancery held a five-day trial in February 2017. Then, on March 6, 2017, Plaintiffs filed a supplemental motion for contempt against Campbell for an additional alleged violation of the Order.[123] And Plaintiffs filed yet another motion for contempt on May 24, 2017, in which they alleged yet another violation of the Court's Order.[124] The court held evidentiary hearings on both supplemental motions for contempt, and Campbell testified at each.[125] But the court delayed its rulings until its decision on personal jurisdiction.[126]

The trial court issued its post-trial opinion on September 1, 2017. It found that the court lacked personal jurisdiction over Campbell for three reasons. First, it determined that

---

[121] *Id.*; Order Awarding Partial Remedy for Defendant's Contempt (Dec. 15, 2016), at 2, available via File&Serve*Xpress*.

[122] *Trial Op.*, 2017 WL 3833210, at *13.

[123] *Id.* at *14.

[124] *Id.*

[125] The second contempt hearing was held on August 28, 2017, just a few days before the court issued its post-trial opinion.

[126] *Id.*

the Contribution Agreement was not a binding contract because the parties failed to agree on the consideration to be exchanged and, thus, it deemed its forum selection provision favoring Delaware to be unenforceable. Second, it believed that the parties failed to agree to the terms of the LLC Agreement separate and apart from the Contribution Agreement and, thus, it similarly found the forum selection provision in the LLC Agreement unenforceable. Third, the Court of Chancery determined that Campbell was not subject to personal jurisdiction via Section 18-109 of the Delaware Limited Liability Company Act, which provides for the implied consent to personal jurisdiction of all persons *named* as a manager or who *act* as a manager of a Delaware LLC.[127] The Court of Chancery observed that the Plaintiffs did not contend that Campbell became a manager of Holdings by executing the April Letter Agreement. And it concluded that "[t]he record does not show that Campbell ever managed Eagle Force Holdings or any other Delaware entity"[128] — just Associates and EF Health, which are Virginia entities.[129] Thus, the trial court deemed Section 18-109 inapplicable. And, finally, because the court decided that it lacked personal jurisdiction over Campbell, it held that its prior contempt orders were unenforceable and that it could not decide the pending contempt motion.

Appellants dispute each of the Court of Chancery's conclusions in this appeal.

---

[127] *Id.* at \*19. In light of our decision to remand on the other issues, we do not reach the issue of whether Campbell was subject to jurisdiction by virtue of 6 *Del. C.* § 18-109(a).

[128] *Id.*

[129] *Id.*

31

## II.

Given that the trial court found it lacked personal jurisdiction over Campbell, the precise question in this appeal is whether there exists any basis for Delaware courts to exercise personal jurisdiction over Campbell. The existence of personal jurisdiction is a mixed question of fact and law.[130] We review the trial court's factual determinations for clear error and its legal rulings *de novo*.[131]

When evaluating whether plaintiffs have met their burden of showing a basis for jurisdiction over a nonresident defendant,[132] Delaware courts invoke a "two-prong" test.[133] First, we consider whether a statute such as Delaware's Long Arm Statute, 10 *Del. C.* § 3104, authorizes service of process on the defendant.[134] Second, we evaluate whether the plaintiff has shown that subjecting the defendant to jurisdiction in Delaware does not violate the Due Process Clause of the Fourteenth Amendment.[135] Compliance with Due Process is satisfied via "the so-called 'minimum contacts' requirement" because, when a nonresident defendant has sufficient minimum contacts with Delaware, that nonresident

---

[130] *Plummer v. Sherman*, 861 A.2d 1238, 1242 (Del. 2004).

[131] *Osborn*, 991 A.2d at 1158.

[132] *AeroGlobal Capital Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 437 (Del. 2005) ("A plaintiff bears the burden of showing a basis for a trial court's exercise of jurisdiction over a nonresident defendant."). At trial, Plaintiffs did not argue that Campbell was subject to personal jurisdiction pursuant to Delaware's Long Arm Statute. *Trial Op.*, 2017 WL 3833210, at *19.

[133] *AeroGlobal*, 871 A.2d at 438.

[134] *Id.*

[135] *Id.*

32

"should 'reasonably anticipate' being required to defend itself in Delaware's courts."[136]

Where a party commits to the jurisdiction of a particular court or forum by contract,[137] such as through a forum selection clause, a "minimum contacts" analysis is not required as it should clearly anticipate being required to litigate in that forum.[138] Here, both Transaction Documents contain forum selection clauses favoring Delaware. This state's courts could also potentially have jurisdiction under Section 18-109 of the LLC Act, which provides for the implied consent to jurisdiction by anyone listed as a manager of a Delaware LLC, given that Campbell is listed as a manager in the LLC Agreement.

Although we defer to the Court of Chancery's factual findings after its careful review of the evidence in these complicated proceedings,[139] we REVERSE and REMAND. We hold that the trial court erred by failing to make a critical finding on the parties' intent to be bound, and in its implicit determination that the terms are not sufficiently definite. In

---

[136] *Id.* at 438, 440.

[137] *See Sternberg v. O'Neil*, 550 A.2d 1105, 1109 n. 4 (Del.1988) ("A party may submit to a given court's jurisdiction by contractual consent."), *overruled on other grounds by Genuine Parts Co. v. Cepec*, 137 A.3d 123 (Del. 2016); *Mobile Diagnostic Grp. Holdings, LLC v. Suer*, 972 A.2d 799, 809 n.47 (Del. Ch. 2009) ("[T]o the extent that a party wants to ensure that it can sue a nonresident in Delaware based on a contract signed by the nonresident outside of this State, it can bargain for consent to jurisdiction in the contract.").

[138] *See Nat'l Indus. Grp. (Holding) v. Carlyle Inv. Mgmt. L.L.C.*, 67 A.3d 373, 381 (Del. 2013) ("Where the parties to the forum selection clause have consented freely and knowingly to the court's exercise of jurisdiction, the clause is sufficient to confer personal jurisdiction on a court."); *Ruggiero v. FuturaGene, plc.*, 948 A.2d 1124, 1132 (Del. Ch. 2008) ("If a party properly consents to personal jurisdiction by contract, a minimum contacts analysis is not required.").

[139] *See Osborn*, 991 A.2d at 1158 ("We review a trial judge's factual findings for clear error.").

33

addition, we hold that the trial court erred in its determination that it lacked jurisdiction to enforce its findings that Campbell violated the court's status quo order.[140]

Our reasoning follows.

### A. The Contribution Agreement

Under *Osborn*, a valid contract exists when (1) the parties intended that the instrument would bind them, demonstrated at least in part by its inclusion of all material terms; (2) these terms are sufficiently definite; and (3) the putative agreement is supported by legal consideration.[141]

### 1. Intent to Be Bound

The first prong of *Osborn* is whether "the parties intended that the contract would bind them."[142] This question looks to the parties' intent as to the contract as a whole, rather

---

[140] *Id.* ("We review questions of law and interpret contracts *de novo*."). It is arguable that Virginia law should apply given that the contract was formed in Virginia and the parties' relationship centered there. *See Certain Underwriters at Lloyds, London v. Chemtura Corp.*, 160 A.3d 457, 464 (Del. 2017) ("Delaware follows the *Second Restatement*'s 'most significant relationship' analysis when considering choice of law in contract disputes.") Though Campbell's answering brief suggests Virginia law could apply, it does not assert a position concerning which law should govern, and it does not argue that there are significant differences between Virginia's and Delaware's laws of contracts. *See* Appellee's Answering Br. at 28-29 ("[W]here the Court applies Virginia law (the locus of all activity relating to the negotiation and creation of the Transaction Documents) or Delaware law, extrinsic evidence is admissible to show that the Transaction Documents never became operative."). We apply Delaware law, as did the Court of Chancery. *See Trial Op.*, 2017 WL 3833210, at *14 n.195.

[141] *See Osborn*, 991 A.2d at 1158-59.

[142] *Id.* at 1058; *see also* 2 Richard A. Lord & Samuel Williston, *Williston on Contracts* § 6:1 (4th ed.) [hereinafter *Williston*] ("Acceptance of an offer is necessary to create a simple contract, since it takes two to make a bargain. An offer to contract is a proposal in the form of an express or implied promise to exchange a promise or an act for a specified return promise or act of another, and it is therefore obvious that the latter's assent is necessary in order to complete the transaction.").

than analyzing whether the parties possess the requisite intent to be bound to each particular term. "Under Delaware law, 'overt manifestation of assent—not subjective intent—controls the formation of a contract.'"[143]   As such, in applying this objective test for determining whether the parties intended to be bound, the court reviews the evidence that the parties communicated to each other up until the time that the contract was signed—*i.e.*, their words and actions—including the putative contract itself.[144]  And, where the putative contract is in the form of a signed writing, that document generally offers the most powerful and persuasive evidence of the parties' intent to be bound.[145]  However, Delaware courts have also said that, in resolving this issue of fact,[146] the court may consider evidence of the

---

[143] *Black Horse Capital, LP v. Xstelos Holdings, Inc.*, 2014 WL 5025926, at *12 (Del. Ch. Sept. 30, 2014) (quoting *Indus. Am., Inc. v. Fulton Indus., Inc.*, 285 A.2d 412, 415 (Del. 1971)); *see also* 2 *Williston*, *supra* note 142, at § 6:3 ("[S]ince the formation of informal contracts depends not upon an actual subjective meeting of the minds, but instead upon outward, objective manifestations of assent, an actual intention to accept is unimportant except in those situations when the acts or words of the offeree are ambiguous.").

[144] *Black Horse*, 2014 WL 5025926, at *12 ("Whether both of the parties manifested an intent to be bound 'is to be determined objectively based upon their expressed words and deeds as manifested at the time rather than by their after-the-fact professed subjective intent.'" (quoting *Debbs v. Berman*, 1986 WL 1243, at *7 (Del. Ch. Jan. 29, 1986))); *see also* Restatement, *supra* note 1, at § 50 cmt. c. (acceptance of an offer "may be made in words or other symbols of assent, or it may be implied from conduct, other than acts of performance, provided only that it is in a form invited or required by the offer.").

[145] *See Seiler v. Levitz Furniture Co. of E. Region*, 367 A.2d 999, 1005 (Del. 1976) ("We have no doubt that the parties intended to be bound by what is written in the April 30 Agreement.  No other conclusion is reasonably possible from the plain words which they used to state their commitment to each other."); *Osborn*, 991 A.2d at 1158-59 (declining to look beyond the face of the document in determining whether the parties intended to be bound by it); *see also infra* note 153.

[146] *Delaware Bay Surgical Servs., P.C. v. Swier*, 900 A.2d 646, 650 (Del. 2006) ("Determining the intent of the parties is a question of fact.").

35

parties' prior or contemporaneous agreements and negotiations in evaluating whether the parties intended to be bound by the agreement.[147]

We also said in *Osborn* that "a contract must contain all material terms in order to be enforceable."[148] Chancellor Allen similarly observed in *Leeds* that, "[u]ntil it is reasonable to conclude, in light of all of the[] surrounding circumstances, that all of the points that the parties themselves regard as essential have been expressly or (through prior practice or commercial custom) implicitly resolved, the parties have not finished their negotiations and have not formed a contract."[149] Though *Leeds* concerned a letter of intent, common sense suggests that parties to a sophisticated commercial agreement, let alone any agreement, would not intend to be bound by an agreement that does not *address* all terms that they considered material and essential to that agreement—a different inquiry than whether these terms are sufficiently definite. As such, all essential or material terms must be agreed upon before a court can find that the parties intended to be bound by it and, thus, enforce an agreement as a binding contract.[150] What terms are material is determined on a case-by-case basis, depending on the subject matter of the agreement and on the contemporaneous evidence of what terms the parties considered essential.[151]

---

[147] *See Black Horse*, 2014 WL 5025926, at *12 ("[C]ourts in Delaware look for 'objective, contemporaneous evidence indicat[ing] that the parties have reached an agreement,' whether that be in the parties' spoken words or writings." (quoting *Debbs*, 1986 WL 1243, at *7)).

[148] *Osborn*, 991 A.2d at 1159 (quoting *Ramone v. Lang*, 2006 WL 905347 (Del. Ch. Apr. 3, 2006)).

[149] *Leeds*, 521 A.2d at 1102.

[150] *See, e.g.*, *Osborn*, 991 A.2d at 1159.

[151] *See Leeds*, 521 A.2d at 1097 ("[O]ur task is to determine the factual setting in which the document that is here claimed to constitute a contract was negotiated and executed and to decide

Here, the Court of Chancery found that "the precise consideration to be exchanged between Campbell and Eagle Force Holdings was highly material to the parties here."[152] The Contribution Agreement addresses the consideration to be exchanged. The only dispute is whether the terms relating to that consideration are sufficiently definite—a subject we address under the second prong of the *Osborn* test.

Regarding the parties' intent to be bound, we observe that Professor Williston has stated that a signature "naturally indicates assent, at least in the absence of an invalidating cause such as fraud, duress, mutual mistake, or unconscionability. . . ."[153] In *Osborn* itself, the signatures of both parties and the notarization of the written agreement provided enough evidence to show that the parties intended to be bound by it.[154] Here, both parties signed

---

the factual question whether a reasonable negotiator in the position of one asserting the existence of a contract would have concluded, in that setting, that the agreement reached constituted agreement on all of the terms that the parties themselves regarded as essential and thus that that agreement concluded the negotiations and formed a contract.").

[152] *Trial Op.*, 2017 WL 3833210, at *16.

[153] Williston, *supra* note 142, at § 6:44; *see also Hough Assocs., Inc. v. Hill*, 2007 WL 148751, at *14 (Del. Ch. Jan. 17, 2007), ("The parties' signatures on the Non-Competition Agreement after nearly six months review, and in the absence of any colorable claim of coercion, manifest mutual assent."), *judgment entered*, (Del. Ch. Jan. 23, 2007); *Kirkwood Motors, Inc. v. Conomon*, 2001 WL 112054, at *2 (Del. Super. Ct. Feb. 5, 2001) ("By reducing the agreement to writing, Kirkwood was demonstrating its intent to be bound by its terms. By signing the agreement, the Conomons were also indicating their intent to be bound by its terms."); *Comolli v. Huntington Learning Ctrs., Inc.*, 683 F. App'x 27, 29 (2d Cir. 2017) (observing that the parties, "in printing their names below the 'Very Truly yours' valediction, 'objective[ly] manifest[ed]' their intent to be bound. Whatever the meaning of the Disputed Signature Line, it would be unreasonable for a person printing her name below the valediction to believe that she was not agreeing to the substance of the release." (quoting *Brown Bros. Elec. Contractors, Inc. v. Beam Const. Corp.*, 361 N.E.2d 999, 1001 (N.Y. 1977))).

[154] *See Osborn*, 991 A.2d at 1158-59 ("The face of this contract manifests the parties' intent to bind one another contractually."); *see also*, *e.g.*, *Schulz v. U.S. Boxing Ass'n*, 105 F.3d 127, 136 (3d Cir. 1997) ("[T]he signatures manifested an intention to be bound by these rules.").

the Contribution Agreement.[155]   That is strong evidence that the parties intended to be bound by it.[156]   Moreover, Campbell and Kay's embrace after signing suggests the parties' reconciliation (however fleeting) and the consummation of a deal, offering additional objective manifestation that the parties intended to be bound by the Transaction Documents.

But we acknowledge that there is evidence that cuts the other way (for example, the "DRAFT" notation and blank schedules).   On remand, the trial court should weigh the evidence and make a finding on the parties' intent to be bound by the Contribution Agreement.[157]

---

[155] *Trial Op.*, 2017 WL 3833210, at *1.

[156] *See supra* note 153.

[157] We note that even Campbell's counsel at oral argument agreed that the trial court had not made a finding as to the first prong of the *Osborn* test and suggested that, if this Court were to reverse on that basis, that it remand the case for the court to make a finding. *See* Oral Argument, *supra* note 116, at 23:20-23:36, 24:40-25:02.  We agree.  Although the Court of Chancery's opinion does state that "Kay and Campbell did not intend to bind themselves to the written terms in the Transaction Documents," *Trial Op.*, 2017 WL 3833210, at *18, for the reasons discussed in this opinion, we do not read this sentence as a finding of fact sufficient to satisfy *Osborn*'s first prong. Among other things, the trial court conflated the analysis under *Osborn* and based its decision largely on its conclusion that the consideration to be exchanged was not sufficiently definite— largely due to the SARS issues. *See id.* at *16 ("Absent definite terms regarding the remainder of the property to be contributed, I find that Campbell and Kay did not come to agreement on the consideration that Campbell would provide in the Transaction Documents.").

## 2. *The Essential Terms of the Contribution Agreement Are Sufficiently Definite*

The second question under *Osborn* is whether the putative contract's material terms are sufficiently definite.[158] This is mostly, if not entirely, a question of law.[159] Though this Court has not articulated a precise standard for what qualifies as sufficiently definite, several of our trial courts have followed the test from Restatement (Second) of Contracts § 33(2), which suggests that terms are sufficiently definite if they "provide a basis for determining the existence of a breach and for giving an appropriate remedy."[160] We adopt

---

[158] *Osborn*, 991 A.2d at 1158; *see also Scarborough v. State*, 945 A.2d 1103, 1112 (Del. 2008) ("As every first year law student learns, one of the central tenets of contract law is that a contract must be reasonably definite in its terms to be enforceable."); 2 Joseph M. Perillo & Helen Hadjiyannakis Bender, 1-4 *Corbin on Contracts* § 4.1 (1993) [hereinafter *Corbin*] ("A court cannot enforce a contract unless it can determine what it is.")

[159] *See Osborn*, 991 A.2d at 1158-61 (applying *de novo* review when evaluating whether the contract was sufficiently definite); *see also Reynolds v. Univ. of Pennsylvania*, 483 F. App'x 726, 735 (3d Cir. 2012) ("[U]nder Pennsylvania law the issue of whether the terms are sufficiently definite to be enforced is a question of law. (citing *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 585 (3d Cir. 2009))).

[160] *See Carteret Bancorp, Inc. v. Home Grp., Inc.*, 1988 WL 3010, at *9 (Del. Ch. Jan. 13, 1988) (citing Restatement, *supra* note 1, § 33(2)); *Bryant v. Way*, 2011 WL 2163606, at *4 (Del. Super. Ct. May 25, 2011) ("[T]he Court will deny the existence of a contract only if the terms 'are so vague that a Court cannot determine the existence of a breach.'" (quoting *Cont'l. Ins. Co. v. Rutledge & Co., Inc.*, 750 A.2d 1219, 1230 (Del. Ch. 2000)); *Cont'l Ins.*, 750 A.2d at 1230 ("Where terms in an agreement are so vague that a Court cannot determine the existence of a breach, then the parties have not reached a meeting of the minds, and a Court should deny the existence of the alleged agreement." (citing *Haft v. Dart Grp. Corp.*, 877 F. Supp. 896, 906 (D. Del .1995))); *Indep. Cellular Tele., Inc. v. Barker*, 1997 WL 153816, at *4 (Del. Ch. Mar. 21, 1997) ("The material terms of a contract will be deemed fatally vague or indefinite if they fail to provide a reasonable standard for determining whether a breach has occurred and the appropriate remedy." (citing Restatement, *supra* note 1, § 33(2))); *Litle v. Waters*, 1992 WL 25758, at *6 (Del. Ch. Feb. 11, 1992) ("The material terms are uncertain where they fail to provide a reasonable basis for determining the existence of a breach and for giving the appropriate remedy." (citing Restatement, *supra* note 1, at § 33(2)); *see also Corbin*, *supra* note 158, § 4.1 (The parties "must have expressed their intentions in a manner that is capable of being understood. It is not even enough that they have actually agreed, if their expressions, when interpreted in the light of accompanying factors

this test.  A contract is sufficiently definite and certain to be enforceable if the court can—based upon the agreement's terms and applying proper rules of construction and principles of equity—ascertain what the parties have agreed to do.  Indeed, as Corbin has stated, "[i]f the parties have concluded a transaction in which it appears that they intend to make a contract, the court should not frustrate their intention if it is possible to reach a fair and just result, even though this requires a choice among conflicting meanings and the filling of some gaps that the parties have left."[161]

The Court of Chancery determined that "the precise consideration to be exchanged between Campbell and Eagle Force Holdings was highly material to the parties here."[162] But the trial court believed that the parties failed to agree on "precise scope" of this consideration: several terms were "either blank or inconsistent with the reality of which Campbell, Kay, Offit, and Rogers were aware."[163]  We disagree.  Accepting the Court of Chancery's factual finding that the consideration to be exchanged was material to the parties' agreement, the text of the executed Contribution Agreement is sufficiently definite. It allows us to ascertain not only the consideration, but also what should happen in the event that Campbell could not actually deliver his specified amounts and provides a means of enforcement if one party proved incapable of performing as promised.

---

and circumstances, are not such that the court can determine what the terms of that agreement are.").

[161] *Corbin*, *supra* note 158, § 4.1.

[162] *Trial Op.*, 2017 WL 3833210, at *16.

[163] *Id.* at *15.

At the very beginning, in the recitals, the Contribution Agreement articulates the consideration to be exchanged. These recitals summarize that Campbell was to contribute to the Company *all* his rights in the Transferred IP and Targeted Companies Securities, as those terms are defined, and that, in return, Campbell was to receive Class A Units constituting half of all issued and outstanding Class A Units at the time of his contribution.[164] The terms of the Contribution Agreement reiterate this statement of the consideration to be exchanged.

For example, Section 2.2(b) specifies that Campbell was to contribute "all right, title and interest in and to <u>any and all</u> Intellectual Property owned in whole or in part by Campbell and which is used or related to, or which can be used or related to: Health; Identity Management; Cybersecurity," and other specified issues.[165] The agreement refers to this intellectual property as the "Transferred IP."[166] As the Court of Chancery acknowledged, Sections 4.20(d) and 4.20(f) "make clear that Schedule 3.5 includes all of Campbell's intellectual property license agreements."[167] Yet the trial court noted that

[164] Executed Contribution Agreement, *supra* note 55, Recitals, at A664 (noting, among other things, that "[t]he parties hereto intend that the contribution to the Company by Campbell of the Targeted Companies Securities and the Transferred IP shall be treated as Campbell's capital contribution to the Company in exchange for which Campbell shall receive Class A Units comprising 50% of the issued and outstanding Class A Units at such time."); *see also* Executed LLC Agreement, *supra* note 81, Schedule A, at A770.

[165] Executed Contribution Agreement, *supra* note 55, § 2.2(b), at A665.

[166] *Id.*

[167] *Trial Op.*, 2017 WL 3833210, at *16. This observation is confirmed elsewhere in the agreement. Section 3.5 reiterates that, at Closing, "Campbell shall assign to the Company . . . those agreements set forth on Schedule 3.5 attached hereto (collectively, the 'Assumed Agreements')." Executed Contribution Agreement, *supra* note 55, § 3.5, at A668. A footnote to

41

Schedule 3.5 is blank and, as such, concluded that the parties "did not reach agreement on which contracts Campbell would assign to Eagle Force Holdings as another part of the consideration in this proposed deal."[168]  The text of the agreement defines which contracts should be delivered as *all* means *all*.  Campbell's obligations were clear without the schedules: he had to contribute the licensing agreements for *all* the Transferred IP, and the text of the executed agreement leaves no doubt about the IP consideration to be exchanged. In addition, the trial court found that the parties had resolved the scope of the intellectual property that Campbell would contribute.[169]

Section 2.2(a) of the Contribution Agreement similarly provides that Campbell shall contribute "all right, title, and interest in and to the Targeted Companies Securities, such that, after such contribution, the Company shall hold all of the Targeted Companies Securities . . . ."[170]  "Targeted Companies Securities" are defined as "the ownership interests (and rights to acquire ownership interests) of the Targeted Companies set forth in Schedule 4.3(a)."[171]  In Section 4.3(e), Campbell represents and warrants that the Targeted Companies Securities listed opposite his name on Schedule 4.3(a) "constitute all of the

that sentence states that "Schedule 3.5 should include any of Campbell's licenses to Intellectual Property."  *Id.* § 3.5 n.2, at A668.

[168] *Trial Op.*, 2017 WL 3833210, at *16.

[169] *Id.* at *7 ("As to the scope of the intellectual property Campbell would contribute, the parties agreed that he would contribute all of the intellectual property he had created that was related to the EagleForce business.").

[170] Executed Contribution Agreement, *supra* note 55, § 2.2, at A665.

[171] *Id.* Exhibit A, at A705.

issued and outstanding Targeted Companies Securities . . . ."[172]  Hence, Campbell had to

contribute all the Targeted Companies Securities, which were equivalent to the securities

next to his name on Schedule 4.3(a).  Schedule 4.3(a) included the header "Capitalization,"

and then, as the Court of Chancery observed, it was left "blank except for the bracketed

text '[Also describe SARS Plan],'"[173] where it seems subsection 4.3(b) was supposed to

appear.[174]  Thus, the trial court concluded that "the schedule that was meant to list an

important part of the consideration Campbell would provide under the agreement is

incomplete,"[175] contributing to the court's view that the parties failed to form a contract.

However, Schedule 4.3(a) is not necessary for determining Campbell's contribution:

Campbell had to contribute "*all* right, title, and interest" in these securities.[176]  Given that

*all* means *all*, additional clarification from Section 4.3(a) similarly is not essential.

Nonetheless, the trial court believed and emphasized that "[t]he objective evidence

of the course of the parties' negotiations shows that whether Campbell owns all of the

---

[172] *Id.* § 4.3(e), at A671.

[173] *Trial Op.*, 2017 WL 3833210, at *15.

[174] SARS Plan is defined as "the existing stock appreciation rights plan currently in effect which is described in <u>Schedule 4.3(b)</u>."  Executed Contribution Agreement, *supra* note 55, Exhibit A, at A704.

[175] *Trial Op.*, 2017 WL 3833210, at *15.

[176] Executed Contribution Agreement, *supra* note 55, § 2.2(a), at A665 (emphasis added).  Further, Section 3.3(a)(i) confirms that, to effectuate this contribution, at Closing, "Campbell shall deliver to the Company the Surrender Documents and Surrendered Securities."  *Id.* § 3.3(a)(i), at A667. "Surrender Documents" means "a letter of transmittal surrender form regarding the surrender of Targeted Companies Securities which shall be in form and substance reasonably satisfactory to Campbell and the Company."  *Id.* Exhibit A, at A705.  Further, "Surrendered Securities" is defined as "(a) certificates representing the Targeted Companies Securities, and (b) assignments and assumptions of interests in Targeted Companies Securities, as applicable."  *Id.*

equity in EagleForce Health and EagleForce Associates is not clear,"[177] given that the

employment agreements of certain employees at the subsidiaries purported to provide for

SARS.[178] We conclude, however, that Section 2.2 is not ambiguous. It is clear that

Campbell promised to deliver all the Targeted Companies Securities. Further, the trial

court's finding that "Kay, Campbell, Offit, and Rogers knew [that Kay and Campbell] had

not come to agreement on the employee claims for equity and the SARs plan"[179] is based

on post-signing extrinsic evidence. Even Campbell acknowledges that "[t]he trial court

reached this conclusion from evidence that, on September 9, 2017 (post-signing), Rogers

had notified Offit of a number of unresolved issues relating to the SARS" and

representations about "waivers of third-party equity claims."[180] The possibility that

Campbell could not deliver all of the Targeted Companies Securities is based upon the

---

[177] *Trial Op.*, 2017 WL 3833210, at \*15 ("Throughout the negotiation of the Transaction Documents, Kay and Offit were concerned about employee claims for some of the equity of EagleForce Associates or EagleForce Health.").

[178] *See also* Employment Letters, *supra* note 40, at A2224-31. Plaintiffs' counsel raises an important issue: whether it was even proper for the trial court to factor these letters into its opinion given that they were never introduced into evidence at trial. *See* Oral Argument, *supra* note 116, at 03:10-03:30 ("There's an evidentiary problem that we raised, and that is that the SARS letters were not introduced at trial. They were actually introduced at a contempt hearing following trial, for a completely different purpose. And, therefore, our position is that the Chancery Court should not have considered them because they were not introduced in evidence at trial.").

[179] *Trial Op.*, 2017 WL 3833210, at \*16.

[180] Appellee's Answering Br. at 32 n. 7. The Court of Chancery looked to evidence after the documents had been signed—from *after* the time of execution—and then used an apparent misalignment between one party's post-execution view and the text of the executed document to find that the terms of the executed document must not have been sufficiently definite. This is a form of "after-the-fact professed subjective intent" that our courts typically refuse to consider. *See, e.g.*, *Sarissa Capital Domestic Fund LP v. Innoviva, Inc.*, 2017 WL 6209597, at \*21 (Del. Ch. Dec. 8, 2017), *judgment entered*, (Del. Ch. Dec. 20, 2017).

hypothetical scenario that claims arising from the Employment Letters (which were never introduced as evidence at trial) would be asserted, and ultimately prove successful.[181] Instead, the question at hand is whether the terms of the agreement itself were sufficiently definite so as to provide a basis for determining a breach. We conclude that the terms of the Contribution Agreement are sufficiently definite.

In addition to promising to deliver all of the Targeted Companies Securities, Campbell represented and warranted that "Campbell is the true and lawful owner of the Targeted Companies Securities set forth opposite his name on Schedule 4.3(a), which constitute *all* of the issued and outstanding Targeted Companies Securities, and has full capacity, power and authority to surrender the Targeted Companies Securities for exchange pursuant to the terms of this Agreement, free and clear of any Encumbrances, and such Targeted Companies Securities are not subject to any adverse claims."[182] And Campbell further represented and warranted that "[n]either Chris Creswell, Said Saleh nor any

---

[181] Even Campbell's Answering Brief refers to SARS as "potential employee claims to equity." Appellee's Answering Br. at 31. The record is woefully undeveloped as to what a "SAR" was meant to be, let alone whether it could have any potential impact on capitalization at the Holdings level, and we question the trial court's basis for its conclusion that it was not clear whether Campbell owned all of the subsidiaries' equity. For one, Plaintiffs' counsel explained at oral argument before this court that the existing SARS offers did not encompass equity ownership. *See* Oral Argument, *supra* note 116, at 5:18-5:19 ("What [a SAR] didn't mean was ownership. Everybody agrees on that. Mr. Campbell agreed on that. Mr. Campbell's counsel, deal counsel, agreed on that. Mr. Kay understood that. And Mr. Kay's deal counsel agreed on that. So, to the extent the court was questioning whether Mr. Campbell owned 100% of the company, the SARS have nothing to do with it because Ownership is different than a right to a payment based on appreciation of the stock value. That's what a SAR is. They're non-voting. You don't own any part of the company. You have a right to a payment, a bonus."). Campbell's attorney did not refute that characterization.

[182] Executed Contribution Agreement, *supra* note 55, § 4.3(e), at A671 (emphasis added).

---

member of the family of Said Saleh have any legal or equitable ownership interest in any Targeted Companies Securities."[183] Similarly, Campbell additionally represented and warranted that "[t]he revenue sharing plans and/or profit sharing plans for Chris Creswell [and other listed employees] . . . have been eliminated without continuing liability to any Targeted Company, and each of the foregoing persons has given the appropriate Targeted Company a legally binding release from any further liability for such plans."[184] Thus, even if Campbell could not deliver all the Targeted Companies Securities as promised, in addition to claims for breach of contract, Kay and the Company had possible recourse through actions for possible breaches via the warranty and/or indemnification provisions.[185] But, again, the possibility that Campbell might not perform is a different question than the definiteness of the putative contract's terms.

---

[183] *Id.*

[184] *Id.* § 4.3(d), at A671. Similarly, Section 4.12(c) of the Contribution Agreement represented and warranted that, "[e]xcept as set forth on Schedule 4.12(c), neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated hereby, . . . will . . . accelerate the vesting, funding or time of payment of any compensation, equity award or other benefit . . . ." *Id.* § 4.12(c), at A675. Kay knew that at least Cresswell's employment agreement stated that his SARS rights vest upon a sale or change of control. *Trial Op.*, 2017 WL 3833210, at *15. But Schedule 4.12(c) was blank. Executed Contribution Agreement, *supra* note 55, Schedule 4.12(c), at A780. Regardless, Kay had obtained Campbell's representation and warranty that the "revenue sharing plans and/or profit sharing plans for Chris Creswell" and other employees, including John Morgan "have been eliminated without continuing liability to any Targeted Company . . . ." *Id.* § 4.3(d), at A671.

[185] We acknowledge the debate over whether a party can recover on a breach of warranty claim where the parties know that, at signing, certain of them were not true. Campbell argues that reliance is required, but we have not yet resolved this interesting question. *See Genencor Int'l, Inc. v. Novo Nordisk A/S*, 766 A.2d 8, 12 n.8 (Del. 2000) (noting that the Court did not need to decide whether detrimental reliance is an element of a claim for a breach of warranty because that issue was not squarely at issue in the case). And we observe that a majority of states have followed the New York Court of Appeals' decision in *CBS Inc. v. Ziff-Davis Publishing Co.*, 553 N.E.2d 997 (N.Y. 1990), which holds that traditional reliance is not required to recover for breach of an

46

Further, assuming that SARS entailed some form of equity ownership and that successful claims were made, the Contribution Agreement includes a provision that articulates how Holdings was to provide for such claims without impacting the equal and shared ownership of Holdings that Campbell and Kay so desired.[186] Section 5.7 of the LLC Agreement, which was integrated into the Contribution Agreement and thus considered part of the agreement,[187] provides:

> At such time as the Board of Managers shall determine, but in no event later than after the Company shall receive its first contract in respect of its business, the Company, the Board of Managers and its officers, and the managers, directors and officers, if any, of each of the Company's Subsidiaries, as the case may be, shall take all actions as are necessary to set aside (i) three percent (3%) of the equity in each of the Company's Subsidiaries, which equity shall be reserved for a stock appreciation rights plan, and (ii) seventeen percent (17%) of the equity in each of the Company's Subsidiaries, which equity shall be reserved for investors, key employees or

---

express warranty:[185] the only "reliance" required is that the express warranty is part of the bargain between the parties. *Id.* at 1001 ("This view of 'reliance'—i.e., as requiring no more than reliance on the express warranty as being a part of the bargain between the parties—reflects the prevailing perception of an action for breach of express warranty as one that is no longer grounded in tort, but essentially in contract."); *see also See* Tina L. Stark, *Nonbinding Opinion*, Bus. Law Today, Jan.-Feb. 2006, at https://apps.americanbar.org/buslaw/blt/2006-01-02/nonbindingopinion.html ("Since the *CBS* case was decided, the majority of states have followed New York."). We need not decide this interesting issue because such claims are not before the court.

Further, Article IV, the "Representations and Warranties of Campbell," begins by stating that "Campbell hereby represents and warrants to the Company that the following representations and warranties are, as of the Execution Date, *and will be, as of the Closing Date, true and correct*." Executed Contribution Agreement, *supra* note 55, Article IV, at A668 (emphasis added). Thus, even though the parties apparently appreciated that the "reality" of not having signed releases in hand did not comport with certain representations at the time of execution, it appears the parties were willing to overlook any problem at signing and allow Campbell to strive to obtain any necessary releases by Closing.

[186] *Trial Op.*, 2017 WL 3833210, at *16 ("From the beginning of Campbell and Kay's negotiations, they communicated to each other that it was very important that they both be 50% owners of the ultimate holding company.").

[187] *See* Executed Contribution Agreement, *supra* note 55, § 8.4(a), at 695-96.

other persons that the Board of Managers shall so determine in its sole discretion.[188]

As noted above, the record is woefully undeveloped as to what a "SAR" was intended to be, let alone whether it could have any potential impact on capitalization at the Holdings level.[189] We are reluctant to find that the agreements fail for lack of definiteness based upon speculation that claims might be asserted; that, if asserted, they will be successful; and that, if successful, they will exceed the amounts set aside in Section 5.7. If all of that comes to pass, it appears that the representations, warranty, and indemnification provisions will be at issue. Facially, these provisions address what the representations and warranties are, and what happens in the event of a breach. Whether they reasonably could

---

[188] Executed LLC Agreement, *supra* note 81, § 5.7, at A739. The inclusion of this provision seems to contradict the trial court's conclusion that "Kay and Campbell's list of thirteen points recognized the problem of the SARs program and began to develop a solution under which Campbell and Kay would each retain equal control, but that was never incorporated into the Transaction Documents." *See Trial Op.*, 2017 WL 3833210, at *15. In addition, Section 5.7 first appeared in Rogers' August 19 draft of the LLC Agreement, the first draft circulated following the Thirteen-Points List of August 14. *See* Rogers' LLC Agreement Redline (Aug. 19, 2019), § 5.7, at A339-40.

[189] *See, e.g.*, Oral Argument, *supra* note 116, at 4:38-5:22 (Kay's Counsel: "I'm not sure that anybody understands what those letters were offering to Mr. Creswell or Mr. Morgan because, as I said, there was no plan. So, our position is and was, and what Mr. Campbell agreed to was, he would obtain releases from those people and tell them that once the corporation, the subsidiaries, were owned by the holding company, a new SARS plan would be introduced, and that they would be offered SARS or whatever was available in that plan, but that the existing offer was in a non-existent plan, so what did it mean? What it didn't mean was ownership. We know that. Everybody agrees on that."); *id.* at 8:34-9:05 (Kay's Counsel: "As far as Mr. Creswell and Mr. Morgan, as Your Honor points out, you can't make heads or tails of what it means. What kind of a claim could they make? Mr. Morgan comes in and says, 'I have 150,000 of something. I don't know what it is.' So the idea was we were going to clean that up by obtaining releases from these folks, and then we were going to produce a SARS plan and offer it to them and it would make sense. That never happened.").

be relied upon under circumstances then presented is a question for another day.[190]  We are satisfied that the provisions contained in the Contribution Agreement provide a basis for determining the existence of a breach and for giving an appropriate remedy.  Thus, they are sufficiently definite.

### 3. The Contribution Agreement Is Backed by Legal Consideration

The last requirement for a valid contract is the existence of legal consideration. The parties do not dispute that legal consideration exists.

If, on remand, the court determines that the *Osborn* test is satisfied, then the Contribution Agreement is enforceable, and the court has personal jurisdiction via the forum selection provision favoring Delaware.

### B. On Remand, the Court of Chancery Should Reconsider Its Determination that the LLC Agreement is Unenforceable

If the Court of Chancery determines that the Contribution Agreement is indeed enforceable, then the trial court's basis for finding the LLC Agreement unenforceable falls away.  But if it determines that the Contribution Agreement is not enforceable, then it should examine the LLC Agreement under the *Osborn* framework, including making a finding on the parties' intention to be bound, with the guidance offered above and below.

---

[190] We note Corbin's word of caution: "The courts must take cognizance of the fact that the argument that a particular agreement is too indefinite to constitute a contract frequently is an afterthought excuse for attacking an agreement that failed for reasons other than the indefiniteness." *Corbin*, *supra* note 158, § 4.1.

49

The trial court had determined, based on its review of extrinsic evidence, that "the parties intended these two Agreements to operate as two halves of the same business transaction,"[191] and thus found that they "rise and fall together."[192] To the extent that the court's conclusion was based on our decision in *E.I. du Pont de Nemours & Co. v. Shell Oil Co.*,[193] we urge it to reexamine that conclusion, as *Shell* speaks more to the *interpretation* of the contracts at issue there—and not the court's evaluation of the parties' intent to be bound.[194]

Like the Contribution Agreement, the four corners of the LLC Agreement suggest a strong intent to be bound at the time of signing. For one, in addition to the signatures of the parties and the LLC Agreement's express statement that each member "intend[s] to be legally bound" by the document,[195] the LLC Agreement provides that they entered into the

---

[191] *Trial Op.*, 2017 WL 3833210, at \*18 (quoting *E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, 498 A.2d 1108, 1114-15 (Del. 1985)).

[192] *Id.*

[193] 498 A.2d 1108 (Del. 1985).

[194] *Trial Op.*, 2017 WL 3833210, at \*18. In *Shell*, the plaintiff DuPont had a contract with the defendant Shell that barred sublicenses, and the Court had to determine whether a contractual arrangement between Shell and a wholly-owned subsidiary of the Union Carbide Company constituted a single "sublicense" that thus breached Shell-DuPont contract. 498 A.2d at 110, 115. This Court noted that the "interrelatedness" of the two Shell-Carbide agreements that were part of this contractual arrangement—including that Shell's obligations under one were contingent on Carbide's performance under the other—"ma[de] it clear that the two parties intended these two Agreements to operate as two halves of the same business transaction" and, thus, the Court *interpreted* the two documents as one. *Id.* We held that, "[w]here two agreements are executed on the same day and are coordinated to the degree outlined above [as indicated in the opinion], in essence, they form one contract and must be examined as such." *Id.* *Shell* did not hold that one of the contracts was only enforceable if the other one was also enforceable and, therefore, has no bearing on the enforceability of the LLC Agreement.

[195] Executed LLC Agreement, *supra* note 81, Background, at A719.

agreement, in part, "to amend and restate the Original LLC Agreement in its entirety. . . ."[196] The fact that the Original LLC Agreement preceded any such contribution agreement additionally underscores that the parties intended to be bound by the LLC Agreement independent of the validity of any other document: it amended and restated a preexisting agreement that stood on its own in the past and could do so in the future. Further, the recitals also suggest that the LLC Agreement had different "material" or essential provisions than the Contribution Agreement as it was meant to serve a different purpose: govern the members' relationships among themselves and clarify the Company's operating structure. The recitals state that the parties entered into this LLC Agreement in order to:

> amend and restate the Original LLC Agreement in its entirety in order to delineate the rights and obligations of the Members and to provide for, among other things, (a) the management of the business and affairs of the Company, (b) the allocation among the Members of the profits and losses of the Company, (c) the respective rights and obligations of the parties to each other with respect to the Company and (d) the addition of Persons (other than EFI) listed on Schedule A attached hereto as additional members of the Company, all as permitted under the Act.[197]

The inclusion of provisions addressing these topics is strong evidence that the LLC Agreement included all material terms.

The LLC Agreement also states in Section 13.1 that "[t]his Agreement . . . contains the entire contract among the Members as to the *subject matter hereof*,"[198] indicating that

---

[196] *Id.*

[197] *Id.*

[198] *Id.* § 13.1, at A755 (emphasis added).

51

the LLC Agreement is a completely integrated document and accordingly emphasizing its independence.

The Severability Clause confirms the LLC Agreement's lack of dependence on any other contract or any particular provision within it by indicating that, if any provision of the LLC Agreement is deemed invalid or unenforceable, the contract should be construed as if the invalid parts were excised and all other portions remain enforceable.[199]

On remand, as with the Contribution Agreement, the Court of Chancery should revisit the evidence and make an express finding on the parties' intent to be bound by the LLC Agreement. In this context, it is important to consider the General Assembly's statement that "[i]t is the policy of [the LLC Act] to give the maximum effect to the principle of freedom of contract and to the enforceability of limited liability company agreements."[200] Given that the parties do not contend before this Court that any terms of the LLC Agreement are not sufficiently definite or that the LLC Agreement is not supported by legal consideration, we conclude that these two prongs are satisfied.

### C. Delaware Courts Retain Jurisdiction to Punish Violations of their Contempt Orders

After presiding over two hearings on the contempt motions, the trial court determined that, because it found that it lacked personal jurisdiction over Campbell, it

---

[199] *See id.* § 13.4, at A756 ("If any provision of this Agreement is determined by a court to be invalid or unenforceable, that determination shall not affect the other provisions hereof, each of which shall be construed and enforced as if the invalid or unenforceable portion were not contained herein.").

[200] 6 *Del. C.* § 18-1101(b); *see also Elf Atochem N. Am., Inc. v. Jaffari*, 727 A.2d 286, 291-92 (Del. 1999).

could not hold Campbell in contempt and impose sanctions for his violations of its status quo order. This Court has not squarely addressed whether the Court of Chancery may impose sanctions on a defendant for violating its status quo order if the court ultimately finds that it lacks personal jurisdiction over the defendant.

The Court of Chancery cited this Court's decision in *Mayer v. Mayer*,[201] in support of its conclusion that, because it lacked personal jurisdiction over Campbell, it could not enforce its prior contempt orders.[202] In *Mayer*, a man who was denied a divorce by the Superior Court in Delaware sold his property in Delaware and moved with all his belongings to Nevada.[203] Soon after settling out West, he filed for divorce in Nevada on the grounds that he had been living apart from his wife for three years—a reason that provided grounds for divorce in Nevada, but not in Delaware. In the meantime, his wife in Delaware sought and obtained an order from the Court of Chancery restraining the husband from continuing with his divorce action in Nevada. The husband's Nevada counsel received the order, but the husband ignored the order and completed the Nevada divorce and remarried. The wife then sought to hold the husband in contempt for violating the Delaware court's order, and the husband appeared specially in the Court of Chancery to move to dismiss the wife's complaint for contempt of the court order for lack of personal jurisdiction, among other reasons. The Court of Chancery granted the husband's motion, and this Court affirmed. In doing so, this Court observed:

---

[201] 132 A.2d 617 (Del. 1957).

[202] *Trial Op.*, 2017 WL 3833210, at *19.

[203] *Mayer*, 132 A.2d at 618.

53

The party charged [with contempt] is always at liberty to defend his disregard of the court's order by showing that the order was void for lack of jurisdiction. In a contempt proceeding based upon the violation of an injunction, the only legitimate inquiry to be made by the court is whether or not it had jurisdiction of the parties and of the subject matter. Subject to this limitation the court will not listen to an excuse for the contemptuous action based upon an argument that the order in question was imperfect or erroneous. No person may with impunity disregard an order of the court having jurisdiction over the subject matter and of the parties.[204]

In *Mayer*, the Court made the only legitimate inquiry—whether it had jurisdiction over the husband *when* it issued its order restraining the Nevada divorce—and this Court agreed with the husband that the Delaware court lacked jurisdiction over him *at the time the court issued the order*.[205] Further, the husband *was not* before the court when the Court of Chancery issued its order. The husband's only appearance before the court was a special appearance to contest personal jurisdiction. And there was never any finding of contempt given the court's determination that it lacked jurisdiction at the outset.

By contrast, in this case, the Court of Chancery issued its status quo order while the defendant was *before the court*, as other proceedings were pending. Several courts have noted that courts may hold proceedings to determine whether it has jurisdiction over a given action and, while doing so, impose orders to preserve the status quo pending the outcome of the proceedings. Indeed, in *R & R Capital LLC v. Merritt*,[206] a decision affirmed by this Court, the Court of Chancery determined that it "has the power to grant

---

[204] *Id.* at 621, *quoted in Cohen v. State ex rel. Stewart*, 89 A.3d 65, 90 n.115 (Del. 2014), and *Trial Op.*, 2017 WL 3833210, at *19.

[205] *Mayer*, 132 A.2d at 621.

[206] 2013 WL 1008593 (Del. Ch. Mar. 15, 2013), *aff'd*, 69 A.3d 371 (Del. 2013).

ancillary injunctive relief to protect its jurisdiction over (and the parties entitlement to a meaningful adjudication of their rights in) the property or other matter that is subject of the action."[207] Those orders would be meaningless absent the power to enforce them.[208]

Moreover, some courts have found that, while a party may contest a contempt order for lack of personal jurisdiction, as the defendant did in *Mayer*, the party waives that right if it voluntarily decides to contest the *merits* of the claim that it violated a court order, regardless of whether that order was validly issued.[209] Campbell did so here as he contested the merits of the court's order. We hold that, when a Delaware court issues a status quo order pending its adjudication of questions concerning its own jurisdiction, it may punish

---

[207] 2013 WL 1008593, at *8 (quoting *E.I. Du Pont de Nemours & Co. v. HEM Research, Inc.*, 576 A.2d 635, 639 (Del. Ch. 1989)).

[208] 12 A.L.R. 2d 1059 § 6 (1950) ("[A] court possesses the power of hearing and determining the question of its jurisdiction, and may while so doing, require the parties to preserve the status of the subject matter, and may punish for contempt disobedience of its temporary restraining order." (citing *Pitcock v. State*, 121 S.W. 742, 744-45 (Ark. 1909))); *see also United States v. United Mine Workers of Am.*, 330 U.S. 258, 293 (1947) ("[T]he District Court had the power to preserve existing conditions while it was determining its own authority to grant injunctive relief. The defendants, in making their private determination of the law, acted at their peril. Their disobedience is punishable as criminal contempt."); *Hayes v. Towles*, 506 P.2d 105, 109 (Idaho 1973) ("In general, a court has the power to order the preservation of the status quo while it determines its own authority to grant relief, and the violation of a restraining order issued for that purpose may be punished as criminal contempt, even if the court subsequently determines that it is without jurisdiction to grant the ultimate relief requested."); *Ohio Contractors Ass'n v. Local 894 of Int'l Hod Carriers', Bldg. & C. L. Union of Am.*, 162 N.E.2d 155, 160 (Ohio Ct. App. 1959) ("[T]he trial court, whether it ultimately determines that it has or does not have jurisdiction upon a consideration of the merits of the case, did have authority to issue the temporary restraining order and the temporary injunction; that it likewise had the power and legal authority to punish for contempt those parties who flagrantly flouted its order prior to a determination of the jurisdictional question upon a consideration of the case on its merits.").

[209] 17 C.J.S. Contempt § 104 ("A voluntary appearance in a contempt proceeding ordinarily confers jurisdiction of the person of the defendant."); *see also id.* § 133 ("[A] voluntary appearance may result in a waiver of defects or irregularities in the commencement of the proceedings, except as to matters affecting jurisdiction of the subject matter.").

violations of those orders with contempt and for sanctions, no matter whether it ultimately finds that it lacked jurisdiction.

## III.

We reverse the trial court's determination that it lacked personal jurisdiction over Campbell and the corollary finding that it could not impose sanctions for contempt. And we otherwise remand this case to the Court of Chancery for proceedings consistent with this opinion.

**STRINE**, Chief Justice, joined by **VAUGHN**, Justice, concurring in part and dissenting in part:

I join in the Majority's decision finding that Campbell cannot escape responsibility for contempt. Having exercised the privilege to litigate before our Court of Chancery, he was bound to honor its orders relating to his behavior, and he cannot escape responsibility for his non-compliance by claiming that he was only before the court to contest the question of personal jurisdiction.

I part company to some extent from the Majority's learned and careful consideration of the Court of Chancery's decision that the August 28th draft Contribution Agreement (the "Draft Contribution Agreement") was not enforceable because it failed to contain certain material terms. Like my friends in the Majority, I agree that the Court of Chancery's analysis tended to blend two issues relevant to formation: whether the parties intended to be bound by the contract and whether the contract contained sufficiently definite terms.[1] These elements are related but distinct. In some ways, the Court of Chancery's decision can be read as based on this chain of reasoning: i) when one reads the Draft Contribution Agreement on its face, it looks markedly different than what one would expect of a final contract; ii) aside from glaring gaps like the date of closing and the date of signing,[2] those gaps also included the absence of key schedules addressing critical issues like the capital

---

[1] *See Eagle Force Holdings, LLC v. Campbell*, 2017 WL 3833210, at *14 (Del. Ch. Sept. 1, 2017) (citing *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010)).
[2] *Id.* at *9.

structure of the company's operating subsidiaries;[3] iv) when one looks to the parol evidence on those gaps, one finds that the parties had not reached closure on them, and that there were fundamental disagreements about risk allocation regarding them;[4] v) even more, the parol evidence revealed that certain material terms in the written document were inconsistent with the objective reality as understood by both Kay and Campbell;[5] vi) therefore, this could not have been intended to be a final contract; and vii) thus the parties did not mean to be bound to the Draft Contribution Agreement on August 28th when they both put their signature on it.

Although the Court of Chancery appears to have determined that "Kay and Campbell did not intend to bind themselves to the terms of the Transaction Documents,"[6] it did not make a clear finding that it was basing its refusal to enforce the Draft Contribution Agreement on that ground. Instead, the trial court more clearly based its ruling on the related point that Kay and Campbell had not reached agreement on terms of the Draft Contribution Agreement they considered essential,[7] and it never, as the Majority rightly finds,[8] resolved the specific fact question of whether Campbell's signature signaled his intention to be bound, as Kay argues, or was just a signal that the parties were making progress toward the goal of a final agreement, as Campbell argues.[9]

---

[3] *Id.*
[4] *Id.* at *15–18.
[5] *Id.* at *16.
[6] *Id.* at *18.
[7] *Id.* at *17.
[8] Majority Op. at 37–38.
[9] *Eagle Force Holdings*, 2017 WL 3833210, at *1.

In this situation, I agree with the Majority that it would have been preferable for the Court of Chancery to have isolated the first factor of the *Osborn* test and decided whether it believed Campbell or Kay as to this point.[10] Although I do not think that trial courts are obliged to cover every *Osborn* factor in every case, especially if it is obvious that one of the factors can be applied efficiently to fairly resolve the case, I understand why the Majority views that as advisable here, given the unusual nature of the facts. Arguably, if Campbell intended to be bound, then one should just read any gaps in the Draft Contribution Agreement against him, when he signed a document that, on issues that the Court of Chancery found unresolved when looking at the parol evidence, tended to be highly unfavorable to him, if one ignores those gaps and the parol evidence, and solely focuses on the language of the Draft Contribution Agreement.

But to the extent that Kay obtained a representation and warranty from Campbell that Campbell was the sole owner of the Targeted Companies, as suggested by the Majority,[11] the evidence supports the Court of Chancery's finding that Kay knew that the representation was false as of the time of the supposed agreement.[12] Both sides knew that several subsidiary employees had viable claims to what seems to be a form of equity. Thus, Kay and Campbell were still trying to get rescission agreements from Cresswell, whose

---

[10] Majority Op. at 37–38.
[11] *Id.* at 45–46.
[12] *See* App. to Opening Br. at A1645 (Cross Examination of Ted Offit) (explaining that his client, Kay, knew that Cresswell and Salah had potential equity claims, and that Kay and Campbell intended to secure a waiver substituting SARS for those potential claims, but had not yet done so).

3

five percent equity in EagleForce Health was to be expressed as SARS;[13] Morgan, who was eligible for SARS in EagleForce Associates;[14] Said Salah, who testified that he has two and a half percent equity in EagleForce Associates and whose employment letter does not refer to SARS;[15] and Hany Salah, whose employment letter gave him one and a half percent equity in EagleForce Associates and does not refer to SARS.[16]

Despite the close nature of the case and my respect for the Majority's analysis, I would nonetheless affirm given the trial evidence buttressing the Court of Chancery's ultimate conclusions. In my view, our law permits the Court of Chancery to consider parol evidence in determining whether the parties formed a contract.[17] That is the position of the Restatement (Second) of Contracts,[18] and of Chancellor Allen's learned analysis in *Leeds*

---

[13] *See id.* at A1891 (Direct Examination of Christopher Cresswell) (explaining that his employment offer letter gave him five percent equity expressed as SARS to avoid tax liability).

[14] *Id.* at A2225 (Employment Offer Letter of General John Morgan) (offering "equity participation . . . in the amount of 300,000 SAR's (150,000 each) valued one dollar ($1) per SAR").

[15] *Id.* at A2128 (Direct Examination of Said Salah) (explaining that Kay knew his employment letter offered equity because Kay reviewed the letter during due diligence and discussed it with him).

[16] *Id.* at A2227 (Employment Offer Letter of Dr. Hany Salah).

[17] *See Hynansky v. Vietri*, 2003 WL 21976031, at *3 (Del. Ch. Aug. 7, 2003) ("In order for the parol evidence rule to apply in all its splendor, one must first present a 'fully integrated agreement.'" (quoting *Taylor v. Jones*, 2002 WL 31926612, at *3 (Del. Ch. Dec. 17, 2002))); 11 Williston on Contracts § 33:15 (4th ed. 2017) ("[W]hat determines whether a writing is an integration is the memorialization of the agreement in writing coupled with an intention that the writing completely embody the contract between the parties. When that occurs, the fact of integration triggers the parol evidence rule."); *Addy v. Piedmonte*, C.A. No. 3571-VCP, 2009 WL 707641 (Del. Ch. Mar. 18, 2009) (explaining that extrinsic evidence may be used to determine if a contract is completely or partially integrated).

[18] Restatement (Second) of Contracts § 214 (Am. Law. Inst. 1981) ("Agreements and negotiations prior to or contemporaneous with the adoption of a writing are admissible in evidence to establish (a) that the writing is or is not an integrated agreement; (b) that the integrated agreement, if any, is completely or partially integrated . . . ."); *id.* § 214 cmt. a ("Writings do not prove themselves; ordinarily, if there is dispute, there must be testimony that there was a signature or other manifestation of assent. The preliminary determination is made in accordance with all relevant

4

*v. First Allied Connecticut Corporation*,[19] a decision that the Court of Chancery has applied many times for over a quarter-century and forms a more established part of our jurisprudence than our recent decision in *Osborn*, which appears to have borrowed a test from an intermediate appellate court in one of our neighboring states that was cited by the Court of Chancery when applying that state's law to a contract claim.[20] I consider *Leeds* a learned and solid articulation of Delaware contract law, as has our Court of Chancery.[21]

Given the unusual looking nature of the Draft Contribution Agreement, and its many odd omissions involving important subjects,[22] the Court of Chancery was justified in considering parol evidence for another reason. The Draft Contribution Agreement was unclear as to key issues, like the capitalization of the key operating subsidiaries, because

---

evidence, including the circumstances in which the writing was made or adopted."); 11 Williston on Contracts § 33:17 (4th ed. 2017) ("The questions whether an integration is intended and whether any integration is partial or total are distinct from and preliminary to the application of the parol evidence rule . . . .").

[19] 521 A.2d 1095 (Del. Ch. 1986).

[20] *Osborn*, 991 A.2d at 1158 (citing *Carlson v. Hallinan*, 925 A.2d 506, 524 (Del. Ch. 2006)); *Carlson*, 925 A.2d at 522 n.95 (applying Pennsylvania law).

[21] *E.g.*, *Greetham v. Sogima L-A Manager LLC*, C.A. No. 2084-VCL, 2008 WL 4767722, at *15 (Del. Ch. Nov. 3, 2008) (Lamb, V.C.); *Loppert v. WindsorTech, Inc.*, 865 A.2d 1282, 1285 (Del. Ch. 2004) (Chandler, C.).

[22] *See, e.g.*, App. to Opening Br. at A683 ("OK DRAFT 8-26-14"); *id.* ("Dated as of August [●], 2014"); *id.* at A664 ("dated as of July [●], 2014"); *id.* at A666 ("Campbell shall deliver verification that he has reopened his previous bankruptcy proceeding **[NOTE: TO BE IDENTIFIED]**."); *id.* at A671 (noting in a footnote that the provision related to Campbell's ownership of the Targeted Companies Securities "may be revised to include Schedule 4.3(b) if there are any options or warrants outstanding"); *id.* at A702 ("['IP Disclosure Schedule' shall mean [●].]").

key text that the agreement's terms called for, such as critical schedules,[23] were absent.[24] When the Court of Chancery examined the parol evidence, it made findings of fact that support its conclusion that the Draft Contribution Agreement's omissions were evidence of missing material terms.[25]

Despite Kay's assertion that he had flat out won on all issues and those issues were resolved in his favor by the Draft Contribution Agreement, the parol evidence supports the Court of Chancery's contrary finding. As of August 28th, the parties still had not worked out the key issue of how to address the written agreements that Kay knew existed that gave key employees of the subsidiaries a right to what looked like equity.[26] The Draft Contribution Agreement contained objective statements about those written agreements that were inconsistent with them, or at least in such tension as to create material ambiguity.[27] And the parol evidence supports the Court of Chancery's finding that the parties had not agreed whether Campbell owned all of the equity of the Targeted Companies in light of the unresolved employee agreements that appeared to give "some

---

[23] *Eagle Force Holdings*, 2017 WL 3833210, at *9–10 (identifying as incomplete Schedule 3.5, listing Campbell's intellectual property license agreements; Schedule 4.3(a), listing the capitalization of the Targeted Companies; Schedule 4.12(c), listing equity awards affected by the transaction; Schedule 4.6, listing certain contractual liabilities of the Targeted Companies; Schedule 4.9, listing all leases, subleases, or licenses to which the Targeted Companies are party; and Schedule 4.15(a), listing pending legal proceedings involving the Targeted Companies).

[24] *See* App. to Opening Br. at A668 (Signed Contribution Agreement) ("Campbell hereby represents and warrants . . . that the following representations and warranties are, as of the Execution Date, and will be, as of the Closing Date, true and correct.").

[25] *Eagle Force Holdings*, 2017 WL 3833210, at *15–18.

[26] *Id.* at *15.

[27] *Id.*

form of equity" to certain employees.[28] As to this point, I respectfully part company from the Majority's conclusion that the Campbell Disclosure Schedules were immaterial and redundant. To my mind, the Court of Chancery was justified in concluding otherwise because the purpose of the Campbell Disclosure Schedules was, in part, to "modify *(by setting forth exceptions to)* the representations and warranties" in the Contribution Agreement.[29]

Likewise, although the Draft Contribution Agreement required Campbell to reopen his bankruptcy proceeding, the Court of Chancery found that the parties were still haggling over that issue and the issue of how to allocate the risk that creditors of Campbell could complain that he had not listed his intellectual property relevant to Eagle Force as an asset in his bankruptcy.[30] For these reasons, I would defer to the Court of Chancery's determination that because "all of the points that the parties themselves regard[ed] as essential" were not "expressly or . . . implicitly resolved," most particularly, the capitalization of the two operating subsidiaries and the effect the subsidiaries' capitalization would have on Kay and Campbell's respective ownership of Eagle Force Holdings, Kay and Campbell "ha[d] not finished their negotiations and ha[d] not formed a contract."[31]

---

[28] *Id.* at *15–16.

[29] App. to Opening Br. at A700 (Signed Contribution Agreement) (emphasis added).

[30] *Eagle Force Holdings*, 2017 WL 3833210, at *7–12 (describing the evolution of the bankruptcy issue from the time it surfaced in July 2014 through November 2014, when Kay alleged that Campbell's failure to reopen his bankruptcy proceeding constituted a breach of the August 28th documents).

[31] *Leeds*, 521 A.2d at 1102; *Eagle Force Holdings*, 2017 WL 3833210, at *1, 17.

In other words, although I agree with the Majority that the Court of Chancery's consideration of two related issues was perhaps less than ideal, the record supports the trial court's related conclusions that the Draft Contribution Agreement was both: i) not sufficiently definite,[32] and ii) not intended to be a final agreement.[33]  Like my colleague, Justice Vaughn, in whose opinion I join, I would therefore defer to the trial court's fact findings and affirm.

I also note that the facts that supported the Court of Chancery's determination that the parties did not reach agreement on material terms also bear importantly on whether Kay can obtain any remedy, other than a return of the capital he risked in the course of trying to forge an agreement with Campbell, plus a fair rate of interest.  Specific performance involves a mandatory injunction and a correspondingly high confidence that the Court knows the specific terms it is ordering to be enforced.[34]  That sort of confidence would, for

---

[32] *Leeds*, 521 A.2d at 1097 (identifying as the test of contract formation "whether a reasonable negotiator in the position of one asserting the existence of a contract would have concluded, in that setting, that the agreement [the parties] reached constituted agreement on all of the terms that the parties themselves regarded as essential and thus that that agreement concluded the negotiations and formed a contract."); *Osborn*, 991 A.2d at 1158 ("A valid contract exists when . . . (2) the terms of the contract are sufficiently definite . . . .").

[33] *Leeds*, 521 A.2d at 1097 ("It is elementary that determination of the question whether a contract has been formed essentially turns upon a determination whether the parties to an alleged contract intended to bind themselves contractually.  A court determining if such intention has been manifested, however, does not attempt to determine the subjective state of mind of either party, but, rather, determines this question of fact from the overt acts and statements of the parties.") (internal citation omitted); *Osborn*, 991 A.2d at 1158 ("A valid contract exists when (1) the parties intended that the contract would bind them . . . .").

[34] *See Osborn*, 991 A.2d at 1159 ("'[A] contract must contain all material terms in order to be enforceable, and specific performance will only be granted when an agreement is clear and definite and a court does not need to supply essential contract terms.'" (quoting *Ramone v. Lang*, No. Civ.A. 1592-N, 2006 WL 905347, at *10 (Del. Ch. Apr. 3, 2006))); *Minnesota Invco of RSA No. 7, Inc. v. Midwest Wireless Holdings LLC*, 903 A.2d 786, 793 (Del. Ch. 2006) ("'Specific

the reasons discussed by the Court of Chancery, be difficult to muster. An order of specific performance would have to specify who owned what, the very issue that the Court of Chancery had a reasoned basis to conclude had not been determined as of August 28th.

Not only that, in deciding whether specific performance is warranted, the interests of others affected by the ruling are to be considered,[35] and it would seem to invite harm to employees and creditors of Eagle Force to issue a remedy that would result in an immediate deadlock between two people who are so adverse.[36] An order of specific performance would likely lead to amended or new pleadings turning this breach of contract case into a follow-on dissolution proceeding.[37]

---

performance is a matter of grace that rests in the sound discretion of the court.' Under Delaware law, a party seeking the equitable remedy of specific performance must prove the existence and terms of an enforceable contract by clear and convincing evidence.") (internal citation omitted).

[35] *See In re IBP Shareholders Litig.*, 789 A.2d 14, 82–83 (Del. Ch. 2001) (considering the effect of a compulsory merger on the companies' employees in light of the parties' conduct during litigation that suggested they cannot work together); *Bernard Personnel Consultants, Inc. v. Mazarella*, Civ.A. No. 11660, 1990 WL 124969, at *3 (Del. Ch. Aug. 28, 1990) (Allen, C.) (noting that "the request for specific performance raises other issues that do not focus upon the time of contracting, but upon the time of enforcement" related to "the traditional concern of a court of equity that its special processes not be used in a way that unjustifiably increases human suffering").

[36] App. to Opening Br. at 1746 (Cross Examination of Richard Kay) (stating that he would not want to cause any harm to employees); *see also id.* at A1906 (Cross Examination of Christopher Cresswell) (stating that his willingness to continue working for Eagle Force under Kay and Campbell depends on the equity component of his compensation).

[37] *Compare id.* at 1745–46 (Cross Examination of Richard Kay) (suggesting he may be able to work with Campbell), *with id.* at A2061–64, 2180 (Direct Examination of Stanley V. Campbell) (describing events over the course of his dealings with Kay that made him wary of entering a business relationship with Kay, including Kay's use of what he believed to be a racial slur).

9

And, as the Majority acknowledges,[38] the Court of Chancery had a basis to find that key provisions of the Draft Contribution Agreement signed on August 28th were at odds with objective reality as Kay understood it. Thus, to the extent Kay is seeking damages because Campbell supposedly made promises that were false, there is doubt that he can then turn around and sue because what he knew to be false remained so. Venerable Delaware law casts doubt on Kay's ability to do so,[39] and a provision of the Draft Contribution Agreement also appears to limit his ability to recover in contract anything other than "in the aggregate . . . the sum of (i) the capital contributed to the Company by Campbell, and (ii) Campbell's pro rata share of Company profits which have not been distributed to Campbell" absent a finding of fraud, intentional misrepresentation, or willful misconduct.[40]

For all these reasons, I would defer to the judgment of our Court of Chancery on the issue of formation in this unusual case. One hopes that before the parties engage in remand

---

[38] *See* Majority Op. at 47 n.185 (acknowledging that the parties "appreciated that the 'reality' of not having signed releases" was inconsistent with the representations and warranties in the Contribution Agreement).

[39] *Clough v. Cook*, 87 A. 1017, 1018 (Del. Ch. 1913) (a party who signs a contract with knowledge that a representation is false may not later claim reliance on it).

[40] App. to Opening Br. at A693 (Signed Contribution Agreement). As to this point, Kay is arguably on stronger ground to recover his invested capital as reliance damages for a claim for promissory estoppel or unjust enrichment, than if the August 28th draft Contribution Agreement is binding. *See Ramone*, 2006 WL 905347, at *14 ("Promissory estoppel involves 'informal promises for which there was no bargained-for exchange but which may be enforceable because of antecedent factors that caused them to be made or because of subsequent action that they caused to be taken in reliance.' The purpose of the promissory estoppel doctrine is to prevent injustice.") (internal citations omitted); *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010) ("Unjust enrichment is 'the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience.'") (internal citations omitted).

proceedings of great expense, they exhale and consider a sensible solution so that they can move on, with Kay receiving fair compensation for his investments, but without harming themselves or others by continuing a bitter battle over whether they should be declared to have had a brief, loveless marriage, only to then commence immediate divorce proceedings.

**VAUGHN**, Justice, joined by **STRINE**, Chief Justice, concurring in part and dissenting in part:

It appears to me that the issue before the Vice-Chancellor was whether the parties had come to a meeting of the minds on all material terms of the contract, not whether agreed upon terms were sufficiently definite to be enforced. I see her analysis as going to the first prong of *Osborn*, that is, whether the parties intended to be bound. After carefully considering the evidence, she concluded that the Transaction Documents lacked agreement on material terms that were essential to the parties' bargain. Such terms included the precise scope of the consideration to be contributed by Campbell, the equity holdings in the Targeted Companies, the status of employee claims, and what contracts Campbell would assign to Eagle Force Holdings. She further found that the parties continued to negotiate on these issues, that the parties had not agreed on who would create certain of the schedules, and that the parties did not intend to complete the Transaction Documents without completion of the blank schedules. She further found that the parties did not assent to the terms of the LLC agreement separately from the Contribution Agreement. Finally, at the end of her analysis, she found that "Kay and Campbell did not intend to bind themselves to the written terms in the Transaction Documents . . . ."[1] I am satisfied there is evidence to support these findings, and that they should receive the deference normally given to the trial court's findings of fact. I would affirm the Vice-Chancellor's determination that no contract was formed for the reasons assigned by her.

---

[1] *Eagle Force Holdings, LLC v. Campbell*, 2017 WL 3833210 (Del. Ch. Sept. 1, 2017).

I agree with the Majority's analysis and conclusion that the Court of Chancery may punish violations of its orders in this case even if it ultimately determines that it does not have jurisdiction over Campbell.